**Harry HENRY and Robert E. Braye, Jr., Plaintiffs-Appellees,**

v.

**A/S OCEAN and John P. Pederson & Sons, Defendants and Third-Party Plaintiffs-Appellees & Appellants,**

v.

**PITTSTON STEVEDORING CORPORATION, Third-Party Defendant-Appellant.**

**Nos. 5, 460, Dockets 73–2153, 73–2868.**

United States Court of Appeals, Second Circuit.

Argued Nov. 1, 1974.

Decided Jan. 6, 1975.

---

Albert V. Testa, New York City (Sidney A. Schwartz, Alexander, Ash, Schwartz & Cohen, New York City, of counsel), for third-party defendant-appellant.

Morris Cizner, New York City (Zimmerman & Zimmerman, New York City, of counsel), for plaintiffs-appellees.

William P. Kain, Jr., New York City (Stephen R. Remsberg, Haight, Gardner, Poor & Havens, New York City, of counsel), for defendants and third-party plaintiffs-appellees and appellants.

Before LUMBARD, MOORE and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

Henry and Braye, two longshoremen, sued the shipowner A/S Ocean and its managers John P. Pederson & Sons for damages for injuries sustained as the result of an accident which occurred while they were working aboard defendant's vessel M/S Dagrun. The shipowner impleaded plaintiffs' employer, the Pittston Stevedoring Company ("Pittston"). Following a trial in the Southern District of New York before Judge Robert L. Carter, the jury returned a verdict finding the M/S Dagrun seaworthy, the shipowner negligent, and that Pittston had breached its warranty of workmanlike performance, thus obligating it to indemnify the shipowner for damages awarded to the plaintiffs. The jury assessed

damages of $57,500 in favor of Henry and $10,000 in favor of Braye.

On this appeal Pittston challenges the jury's verdict in favor of Henry as inconsistent with its finding that the vessel was seaworthy and as unsupported by the evidence. It attacks Braye's verdict as unsupported by competent proof of causation. Pittston further contends that the jury's finding of seaworthiness is inconsistent with its award of indemnity to the shipowner for Pittston's breach of its warranty of workmanlike performance, and that the shipowner's conduct precludes it from obtaining indemnity from Pittston. We affirm the award of damages to Henry and the indemnity award to the shipowner. We agree that liability to Braye was established but find the award of $10,000 excessive and remand for a new trial on damages unless Braye consents to a reduction of the award by $5,000.

On the morning of February 26, 1966, longshoremen employed by Pittston began unloading a cargo of Volkswagen automobiles from the hold of the M/S Dagrun, which was moored at Port Newark. These cars, which were lashed together by ropes and sticks, were stowed in the hold by means of "false decks" consisting of large pontoons. The longshoremen, using the ship's booms, removed the automobiles forming each layer by hoisting them through the hatch and onto the pier. As a layer was removed the lashing debris that remained was placed in a netting, hoisted out of the hold, and dumped at a designated spot on the deck. The pontoons making up the false deck were then removed and placed in special racks on the ship's deck. Thereupon the longshoremen began removal of the next layer of cars.

There was evidence that the ship's mate had directed that the lashing debris be dumped on the deck at a point forward of the pontoon rack between hatches # 1 and # 2. Because the pontoon rack was equipped with cross-pieces at each end, the netting containing the lashings could not be lowered by the boom directly to the spot on the deck where it was to be dumped. Instead,

the longshoremen landed the netting atop the pontoons in the rack. They were then required to push it several feet to the forward end. The height of the pontoon rack on top of which the longshoremen worked was 11 feet. On the outboard side there was a direct drop to the water of some 60 feet. At no time was there a safety line or netting around the pontoons stacked in the rack.

Prior to the accident pontoons from two false decks had been removed and stacked, and the third draft of lashings was about to be removed, lowered to the pontoons and dumped onto the deck. The rack then contained about 6 to 10 feet of stacked pontoons. In order to dump the lashings off the forward end of the pontoons and onto the deck, it was necessary to change the position of the boom from that used to unload the automobiles. Otherwise, as the netting was being dumped, the cargo lift lines would tend to pull the netting back toward the middle of the pontoons, spilling the lashings onto the pontoons. To dump the lashings onto the deck, the longshoremen would have to stand atop the pontoons and push the net forward against the pulling force of the lines.

There was evidence that the winch used to hoist and dump the net of lashings, which was operated by a longshoreman and controlled the cargo lines, had been malfunctioning. In addition the ship's mate had instructed the longshoremen not themselves to reposition the booms but rather to allow the crew to perform the task. When the crew failed after some 15 minutes to respond to a call to reposition the boom preparatory to removal of the third draft, plaintiffs' evidence indicates that the stevedore foreman, one "Bosco," gave an order to proceed without repositioning the boom. To correct the resulting tendency of the lashings draft to be pulled back across the top of the pontoons, plaintiff Henry and a co-worker pushed forward on the lashings draft during the dumping process.

At this point Henry's accident occurred. While Henry pushed forward on the draft, the winch jerked the cargo

lines backward. The cargo hook caught in the cross-piece of the pontoon rack. This caused the line suddenly to go taut, striking Henry in the left shoulder and knocking him overboard.

Plaintiff Braye, on learning of Henry's plight, ran onto the deck, removed his clothes, and jumped into the water to rescue Henry. It then took the ship's mate 15 minutes to locate and toss a lifebuoy into the water. Eventually a pontoon was lowered to remove Henry and Braye from the water. Thus Braye was obliged to remain in the cold and polluted water for about 20 minutes. He testified that following his immersion he suffered colds and a skin rash over a three-year period following the accident and ultimately was forced to move to California.

## DISCUSSION

### I. *Inconsistency of the Jury's Verdict*

Pittston argues that the jury's finding that the ship was not unseaworthy eliminates any basis for its finding of negligence on the part of the shipowner, since the claim of negligence was based on alleged unseaworthy conditions, i. e., defectiveness of the winch, improper spotting of the boom and failure to provide a safe place to work on top of the pontoons. We disagree. Some of the conditions, it is true, might be common to both claims. Unseaworthiness, for instance, has been broadly defined in some cases to encompass employment of a dangerous method of operating equipment that would otherwise be seaworthy, Crumady v. The J.H. Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); Blassingill v. Waterman Steamship Corp., 336 F.2d 367 (9th Cir. 1964); Sanchez v. Lubeck Linie A.G., 318 F.Supp. 821 (S.D.N.Y.1970), or failure to provide appropriate safety equipment, Salem v. United States Lines, 370 U.S.

31, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962); White v. Rimrock Tidelands, Inc., 414 F.2d 1336 (5th Cir. 1969).

If the trial judge had used such a general definition of unseaworthiness in the present case, Pittston might conceivably have some support for its position. Judge Carter, however, limited the jury to a narrow definition of the term, instructing that the jury could find unseaworthiness only if it found that plaintiffs' injuries were caused by defective equipment, i. e., equipment that was not reasonably fit for its intended purpose.[1] In view of the court's limitation of unseaworthiness to the condition of the ship's equipment the jury may reasonably have concluded that other claims (e. g., failure to reposition the booms properly) could only be resolved on a negligence theory. The jury's findings on unseaworthiness and negligence were therefore not necessarily inconsistent. The situation here is thus distinguishable from that in Spano v. N.V. Koniklijke Rotterdamsche Lloyd, 2 Cir., 472 F.2d 33, 35 n.1, where the court stated that "[i]t is hard to imagine . . . how an owner could be negligent, if the ship was not unseaworthy." See also Rice v. Atlantic Gulf & Pacific Co., 484 F.2d 1318, 1320 (2d Cir. 1973).

Even if the court had defined unseaworthiness in broader terms, we would hesitate in these circumstances to overturn the jury's findings of seaworthiness and negligence on grounds of inconsistency. Verdicts finding negligence but no unseaworthiness have been accepted despite an apparent conflict in the findings. See, e. g., Weyerhaeuser Steamship Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958); Drago v. A/S Inger, 305 F.2d 139 (2d Cir.), cert. denied sub nom., Daniels & Kennedy, Inc. v. A/S Inger, 371 U.S. 925, 83 S.Ct. 292, 9 L.Ed.2d 232

---

1. On the issue of unseaworthiness Judge Carter instructed the jury:

   "An injury is proximately caused by unseaworthiness of a vessel when it appears from the evidence in a case that the allegedly *defective equipment* played a sub-

stantial part in bringing about or actually causing the injury or damage. The shipowner is required to provide *equipment* which is only reasonably fit." (Emphasis added).

(1962). In Malm v. United States Lines, 269 F.Supp. 731 (S.D.N.Y.), affd. on the district court's opinion, 378 F.2d 941 (2d Cir. 1967), for instance, Judge Weinfeld, observing that the law "at times recognizes the jury's right to an idiosyncratic position," upheld just such a verdict. The general rule that a court should reconcile the jury's verdict if at all possible, Gallick v. Baltimore & Ohio R.R., 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963), is entitled to broad application. No straining is required in this case, however, to reconcile what might at first blush appear to be an inconsistency.

## II. *Recovery of Indemnity when Shipowner is Negligent*

■ Pittston next contends that the jury's determination that the shipowner was negligent, although its ship was seaworthy, should preclude the shipowner from obtaining indemnity from Pittston based upon breach of its warranty of workmanlike performance. This warranty, which arises from the stevedore's contract to render services to the shipowner, requires the stevedore to perform its tasks in a competent and safe manner. Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 133–134, 76 S.Ct. 232, 100 L.Ed. 133 (1956). Pittston argues that a finding of unseaworthiness should be a condition precedent to a shipowner's recovery over against the stevedore for breach of its warranty of workmanlike service and that the shipowner's liability for negligence in causing the accident should preclude its recovery over against the stevedore upon the warranty. We disagree.

■ The stevedore's liability for breach of warranty does not rest upon the nature of the shipowner's liability (i. e., whether it is based upon unseaworthiness rather than upon negligence) but upon the stevedore's own contractual obligation to the shipowner. Ryan Stevedoring Co. v. Pan-Atlantic Corp., 350 U.S. 124, 131–132, 76 S.Ct. 232, 238, 100 L.Ed. 133 (1956) ("the contractor, as the warrantor of its own services, cannot use the shipowner's failure to discover and correct the contractor's own breach of warranty as a defense"). The breach of this contractual obligation is readily apparent where the stevedore's failure to provide workmanlike service brings into play the defect upon which the unseaworthiness claim is founded, see Crumady v. The J.H. Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959). In such a case, moreover, the doctrine of indemnity serves to allocate risks among those segments of the enterprise best able to minimize the particular risk involved. Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., 376 U.S. 315, 323, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964); Seas Shipping Co. v. Sieracki, 328 U.S. 85, 94, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); DeGioia v. United States Lines, 304 F.2d 421, 426 (2d Cir. 1962). The stevedore's warranty requires it to perform its services properly in the face of known defects, and therefore the stevedore has been required to correct those defects or stop work until they are corrected. Mortensen v. A/S Glittre, 348 F.2d 383 (2d Cir. 1965); Brock v. Coral Drilling, Inc., 477 F.2d 211, 216 (5th Cir. 1973). Since the stevedore is in immediate control of the area of the ship in which he performs his functions, risks are minimized by requiring the stevedore to indemnify the shipowner whenever a substandard performance renders the shipowner liable. See Bertino v. Polish Ocean Line, 402 F.2d 863, 866 (2d Cir. 1968); DeGioia v. United States Lines, *supra*, 304 F.2d at 425. Where the shipowner's liability for violation of his non-delegable duties, whether cognizable under a theory of unseaworthiness or of negligence, is attributable to the stevedore's action or inaction in breach of his contractual obligation, the recovery of indemnity should not turn on the particular theory selected by the plaintiff as the basis of his suit against the shipowner.

■ Tort principles have no application to an indemnity claim, even though the stevedore's breach depends on whether he "rendered a substandard performance." *Ryan Stevedoring Co.,*

*supra,* 350 U.S. at 134,[2] 76 S.Ct. 232, 100 L.Ed. 133. The tort law concept that there shall be no contribution among joint tortfeasors therefore becomes irrelevant, and, as *Weyerhaeuser* implied, indemnity may be awarded even though both stevedore and shipowner are in some sense "at fault."

▌ For these reasons the shipowner's negligence does not necessarily preclude it from recovering indemnity against the stevedore. See *Weyerhaeuser Steamship Co., supra;* Drago v. A/S Inger, *supra;* Williams v. Pennsylvania Railroad Company, 313 F.2d 203, 209–212 (2d Cir. 1963); Nicroli v. Den Norske Afrika-O.G. Australielinie, etc., 332 F.2d 651, 656 (2d Cir. 1964); McNamara v. Weichsel Dampfschifffahrts A.G. Kiel, 293 F.2d 900, 903 (2d Cir. 1961); Albanese v. N.V. Nederl. Amerik. Stoom.-Maats, 346 F.2d 481, 484 (2d Cir.), revd. on other grounds, 382 U.S. 283, 86 S.Ct. 429, 15 L.Ed.2d 327 (1965) (per curiam).[3] As the Supreme Court stated in Italia Soc. v. Ore. Stevedoring Co., 376 U.S. at 321, 84 S.Ct. at 752 (1964):

> "[R]ecovery in indemnity for breach of the stevedore's warranty is based upon an agreement between the shipowner and stevedore and is not necessarily affected or defeated by the shipowner's negligence, whether active or passive, primary or secondary. Weyerhaeuser S.S. Co. v. Nacirema Operating Co., *supra.*"

The shipowner's own conduct will preclude it from obtaining indemnity from the stevedore only where it prevented or seriously handicapped the stevedore in his effort to perform his duties. "Merely concurrent fault is not enough," Albanese v. N.V. Nederl. Amerik. Stoom.-

Maats, 346 F.2d at 484, citing Misurella v. Isthmian Lines, 328 F.2d 40 (2d Cir. 1964), and *Weyerhaeuser S.S. Co., supra.*

▌ Applying these principles to the present case, there was ample evidence to support the conclusion that Pittston's conduct was responsible for the plaintiff's accident and that Pittston was not prevented by the shipowner from rendering safe and workmanlike service that would have avoided the accident, even though the shipowner was negligent. Although the shipowner may have failed to respot the boom, it was the stevedore's foreman who, instead of waiting for the shipowner to do so, gave the order to remove the lashings draft while the boom remained in the incorrect position. Similarly, while the shipowner may have permitted the use of a dangerous method of unloading the lashings, Pittston took no action to stop its employees from working atop the pontoons or to supply a safety line.[4] Since the stevedore was in a position to avert the injuries, the jury was entitled to find that Pittston's actions did not constitute reasonable performance of its warranty.

### III. *Other Errors in the Indemnity Verdict*

Pittston contends that, as a matter of law, the shipowner engaged in conduct sufficient to preclude recovery of indemnity, *Weyerhaeuser, supra.* However, this argument must be rejected for the reason that it is based solely on the view that the ship's mate gave an order to the longshoremen to continue using the defective winch, whereas the verdict indicates that the jury rejected plaintiffs' claims founded on the winch and relied instead on his alternate theories.

---

2. "The shipowner's action is not changed from one for a breach of contract to one for a tort simply because recovery may turn upon the standard of the performance of petitioner's stevedoring service." 350 U.S. at 134, 76 S.Ct. at 237.

3. Schwartz v. Compagnie General Transatlantique, 405 F.2d 270 (2d Cir. 1968), upon which Pittston relies, is clearly distinguishable. That case dealt solely with the question of whether the relationship between the ship-

owner and the proposed indemnitor, the United States Government, permitted the implication of a warranty of workmanlike service. The case held that it could not.

4. A stevedore is required to supply a safety line or net when the edge of a hatch section or stowed cargo is more than eight feet high and presents a danger of persons falling. U. S. Dept. of Labor, Safety and Health Regulations for Longshoring § 9.32(b).

Pittston finally contends that it was entitled to a special interrogatory on the question of whether the shipowner's conduct precluded recovery of indemnity, since other interrogatories, including one on the indemnity question, were submitted to the jury. Under certain circumstances it is error to submit a special verdict on some but not all issues, Palmiero v. Spada Distrib. Co., 217 F.2d 561 (9th Cir. 1954); United States v. Trinity Univ. Ins. Co., 457 F.2d 950 (5th Cir. 1972). If, for example, an interrogatory is submitted on one of two alternative claims that are neither inconsistent nor mutually exclusive, an interrogatory should also be submitted with respect to the other. The question of "conduct sufficient to preclude" indemnity, however, can hardly be considered an issue distinct from that of indemnity. Furthermore, where a jury must make a finding on a certain issue in order to reach its verdict, failure to submit a special interrogatory on that issue is not reversible error. Bolan v. Lehigh Valley R.R., 167 F.2d 934, 937 (2d Cir. 1948). Judge Carter properly instructed the jury that indemnity should be denied if conduct on the shipowner's part obstructed or hindered the stevedore in his effort to perform a workmanlike job. We assume the jury took this instruction into account in answering the indemnity interrogatories. The jury, therefore, had to find no obstruction or hindrance by the shipowner before awarding it indemnity against Pittston.

IV. *Damages Awarded Braye*

Pittston argues that there was insufficient evidence to establish Braye's damage claim. The shipowner generally agrees with this position, but urges that we merely exercise our power to grant a remittitur, Dagnello v. Long Island R.R., 289 F.2d 797 (2d Cir. 1961).

Braye, of course, was obligated to offer some reasonable proof that his injuries were proximately caused by the shipowner's breach of duty. Fitzgerald v. A. L. Burbank & Co., 451 F.2d 670, 681 (2d Cir. 1971). Direct medical testimony of causation need not be introduced in every case, Sentilles v. Inter-Caribbean Shipping Corp., 361 U.S. 107, 109–110, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959). But a jury "is not permitted to speculate on proximate cause in the absence of reasonably persuasive proof that the negligence was the probable cause of the injury," *Fitzgerald, supra*, at 681 of 451 F.2d.

In this case Braye testified that he suffered continuous colds and a skin rash after the accident, and introduced a hospital report suggesting the existence of a rash. But he offered no proof whatever to link the colds and the rash to the accident. Defendants, on the other hand, produced expert medical testimony that plaintiff's skin rash could not have been caused by exposure to the water of Jersey Bay. The defendants' expert testified that the rash appeared only in two isolated places on Braye's cheeks, while a rash caused by contact with polluted water would have been visible over plaintiff's entire body. While admitting that the exposure might have caused a serious cold, he stated that there was absolutely no connection between the exposure and the subsequent colds plaintiff claims to have suffered.

Braye thus failed to offer any evidence that his subsequent colds or skin rash were caused by the accident, and a jury could not reasonably have so found. Judge Carter excluded testimony by Braye concerning the cause of his conditions, and this was proper since lay testimony to the medical fact beyond the witness's knowledge would be entitled to no weight. See Franklin v. Shelton, 250 F.2d 92, 97 (10th Cir. 1957), cert. denied, 355 U.S. 959, 78 S.Ct. 544, 2 L.Ed.2d 533 (1958); Sheptur v. Procter & Gamble Dist. Co., 261 F.2d 221, 223 (6th Cir. 1958), cert. denied, 359 U.S. 1003, 79 S.Ct. 1136, 3 L.Ed.2d 1031 (1959). The jury was thus left with no competent proof of causation.

Braye was entitled to some damages since the jury did have evidence that he suffered some pain from his 20-minute exposure to the cold water, that he lost his clothing, and that he suffered a bad

cold. But an award of $10,000 for these limited injuries is grossly excessive. We therefore order a new trial on Braye's damage claim unless he consents to a reduction of his award by $5,000.[5]

Affirmed in part and reversed in part.

---

5. Plaintiff argues that we are powerless to consider a remittitur since Pittston failed expressly to move before the district court to set aside the verdict for excessiveness, which would have permitted that court to exercise its discretion in the matter. See Vaught v. Childs Co., 277 F.2d 516 (2d Cir. 1960); 6A Moore's Federal Practice ¶ 59.14. However, Pittston's post-trial motion to set aside the verdict and for a new trial may be interpreted as seeking a remittitur since it rested on the argument that while Braye may have suffered a cold and hospitalization, he had failed to establish that his skin rash and later colds were in any way attributable to the accident. In a post-trial affidavit filed with the district court, shipowner so construed Pittston's motion. Shipowner urged that the jury's award should be "very substantially reduced" or a new trial granted on the issue of damages. Since the alternative of remittitur thus was presented to the district court, we may in these circumstances direct that such relief be granted.