510 F.2d 950
 Maria IANUZZI, Plaintiff-Appellant,
v.
SOUTH AFRICAN MARINE CORPORATION, LTD., Defendant &
Third-Party Plaintiff-Appellee-Cross-Appellant,
v.
INTERNATIONAL TERMINAL OPERATING CO., INC., Third-Party
Defendant-Cross-Appellee.
 No. 466, Docket 74--1902.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 7, 1975.
Decided Feb. 10, 1975.
 
 Martin L. Katz, Brooklyn, N.Y. (Paul A Gritz, Brooklyn, N.Y., on the brief), for plaintiff-appellant.
 William P. Kain, Jr., New York City (Haight, Gardner, Poor & Havens, New York City, Thomas F. Molanphy, New York City, of counsel), for defendant and third-party plaintiff-appellee-cross-appellant.
 Joseph N. Cohen, New York City (Alexander, Ash, Schwartz & Cohen, Sidney A. Schwartz, New York City, of counsel), for third-party defendant-cross-appellee.
 Before SMITH, OAKES and TIMBERS, Circuit Judges.
 J. JOSEPH SMITH, Circuit Judge:
 
 
 1
 On November 24, 1968, Mario Ianuzzi, a longshoreman in the employ of International Terminal Operating Co., Inc. (ITO), was fatally injured while working on board the M/V South African Huguenot, owned by South African Marine Corporation, Ltd. (South African). Ianuzzi's wife Maria, his administratrix, commenced this action against South African in the United States District Court for the Southern District of New York to recover damages for the death of her husband, relying on theories of negligence and unseaworthiness. South African impleaded ITO, seeking indemnity for breach of ITO's warranty of workmanlike service. At the conclusion of the evidence, the court, Richard Owen, Judge, dismissed the negligence claim for failure of proof, but submitted the unseaworthiness claim to the jury. The jury found, in response to an interrogatory, that plaintiff had failed to make out her claim of unseaworthiness, and the court entered judgment for South African in plaintiff's action on the basis of that finding. South African and ITO then agreed to submit the third-party claim to the court, rather than risk an inconsistent determination by the jury.[1] That claim was dismissed by the court. Plaintiff appeals from the dismissal of her negligence claim, and South African has taken a protective cross-appeal from the dismissal of its third-party claim. We affirm.
 
 I. THE PROCEEDINGS IN THE DISTRICT COURT
 
 2
 It is undisputed that, at the time of the accident, Ianuzzi's gang of longshoremen was engaged in loading cargo with the Huguenot's hydraulic winch system. The method employed involved the use of two separate booms, each with its own winch. One boom, called the 'up and down' boom, was positioned with its head directly over the hatch. The other, known as the 'burton' boom, was positioned over the pier. The falls (hoisting lines) from the two booms were 'married,' that is, joined together to a single cargo hook. The loading operation would start with the burton fall in a vertical position, that is, with the cargo hook hanging over the pier directly under the head of the burton boom. Once the cargo was attached to the hook, the winch operator would raise the cargo up off the pier by putting the controls for the burton winch in the 'hoist' position. When the cargo was high enough to pass over the ship's rail with sufficient clearance, the winch operator would move it horizontally to a position directly over the hatch by gradually taking in the up and down fall while simultaneously slacking off on the burton fall. With the cargo over the hatch, simply letting out the up and down fall would lower the cargo through the hatch and into the hold. The entire operation was thus accomplished solely by taking in and slacking off the falls in the proper sequence, while the booms themselves remained stationary.
 
 
 3
 According to plaintiff's witnesses, while the longshoremen were loading cars in the above manner Ianuzzi was on the Huguenot's main deck, leaning over the coaming of the number three hatch--the same hatch through which the cars were being lowered. As the winch operator was 'burtoning' a car across from the pier to the hatch, the burton winch began slacking off too quickly, causing the car to drop suddenly and swing in a downward arc. As the car swung over the hatch coaming, it supposedly struck Ianuzzi and knocked him down the hatch to the upper 'tween deck.
 
 
 4
 This version of the accident was supported by the testimony of Coppola, the winch operator; Garofala, the hatch boss; and Scotto, the gangwayman.[2] Coppola did not actually see the car strike Ianuzzi, but he testified to the fact that the car swung erratically. Garofala was on the upper 'tween deck at the time of the accident, and it was his testimony that as he looked up he saw Ianuzzi leaning over the coaming, being struck by the car, and falling through the hatch. Scotto, who was on the main deck giving signals to Coppola, said that as the car swung he turned and ducked, and that as he did so he saw the car strike Ianuzzi and knock him down the hatch.[3]
 
 
 5
 In order to fix liability on the shipowner under this factual theory, plaintiff of course had to establish that the car swung because of winch malfunction, rather than solely because of operator error.[4] In order to meet this burden, plaintiff produced an expert witness, Ferenczy, who testified regarding the operational characteristics of the Huguenot's hydraulic winches. The winch controls operated by Coppola were remote controls; that is, they were not located directly on the winches, but rather were connected by a hydraulic system to the manual controls on the winches themselves.[5] Movement of the remote control would exert pressure at one end of an enclosed volume of hydraulic fluid within the system. Since the fluid is noncompressible, any pressure exerted at one end of the system would be transmitted at full strength throughout the system; thus, at the manual end, the pressure would be equal to the pressure exerted at the remote end. The manual control, therefore, would move to reflect exactly the movement of the remote control by the winch operator. If the remote control were moved five degrees, for example, the manual control would respond by moving five degrees.
 
 
 6
 The key to proper operation of a hydraulic system such as this is the non-compressibility of the hydraulic fluid. If a compressible substance, such as air, were allowed to enter the system, then the pressure exerted at the remote end would be absorbed, at least in part, in the compression of the air. The result would be that the manual control, rather than following the remote control exactly, would lag behind it to a degree dependent on the amount of air in the system. Thus, is the remote control were moved five degrees, the manual control would respond by moving perhaps only two or three degrees.
 
 
 7
 It was Ferenczy's expert opinion that, if the swooping of the car occurred as Coppola testified, the cause would have been air in the remote system.[6] According to Ferenczy, the winchman would move the remote handle a small amount at first, but would not get the desired result; he would then subconsciously move the handle even further, and when the system finally responded it would do so too quickly.[7] Apparently, plaintiff relied essentially on this opinion to establish her claim of unseaworthiness. With regard to negligence, she attempted to show that South African had notice of this defect in the winch through the testimony of Coppola, who had complained about the operation of the remote control handles to the ship's personnel, and of Scotto, who had relayed to the ship's personnel several complaints about the handles by Coppola and other winch operators. The evidence was undisputed, however, that the complaints by the winch operators had to do with 'stiffness' in the handles. South African produced two experts of their own, Napolitano and Wheeler, who testified that air in the remote system would not have resulted in stiffness in the handles, but rather in loose, 'mushy' operation. Ferenczy himself had to agree that stiffness would not result from an air pocket, making the testimony in that regard uncontradicted. In addition, it was Coppola's testimony that he did not experience any trouble with the handles at the time of the accident, that his earlier problems did not recur at the time of the accident, that the accident occurred when the burton slackened all at once, and that this particular problem had not occurred prior to the accident. The district court, therefore, refusing to permit plaintiff to equate 'stiffness' in the handles with 'looseness' or 'mushiness,' held that plaintiff had failed as a matter of law to prove that whatever defect (if any) that caused the accident was a defect of which South African had notice; thus, it dismissed plaintiff's negligence claim.
 
 
 8
 The claim of unseaworthiness still presented a jury issue, however, but the case was hardly as clear as it might have appeared from a consideration of plaintiff's evidence alone. South African and ITO claimed that the accident did not occur as theorized by plaintiff at all. In their version, Ianuzzi was not killed by a fall from the main deck to the upper 'tween deck; rather, they presented evidence indicating that he was on the upper 'tween deck all the time, and that he was killed when a carpenter named Andre (employed neither by South African nor ITO)[8] dropped a piece of lumber through the number three hatch onto Ianuzzi's head. According to Andre, he was passing lumber down to the upper 'tween deck where it was being used by other carpenters to chock the cars that were being loaded. He would lean over the hatch coaming, holding out the lumber vertically in such a way that the ends of the boards extended about two feet over his head. When he got the 'all clear' signal from a carpenter below, he would release the lumber, allowing it to drop straight down in its vertical position. He testified that, as he was leaning over the coaming with one load of lumber, preparing to drop it, the boards were suddenly knocked from his hands by something (presumably, the car) swinging over his head. He hit the deck to get out of the way, and when the danger had passed he became aware of a commotion in the hold. Looking over the coaming, he saw a man lying on the deck, apparently injured. He concluded that he must have dropped the lumber on the man (who turned out to be Ianuzzi), and told the ship's crew and the police that that was what happened.
 
 
 9
 In support of Andre's testimony, ITO introduced the testimony of Dr. DiMaio, who performed the autopsy on Ianuzzi. He testified that Ianuzzi's only injury was a fracture on the very top of the skull, and that this injury was compatible with a blow to the head from a piece of lumber dropped from directly above. On cross-examination, he conceded that the injury was also compatible with a fall directly on the top of the head, but thought that if that had happened there would likely have been other injuries as well.
 
 
 10
 The parties agreed that the case would first be submitted to the jury on plaintiff's unseaworthiness claim alone, reserving the third-party claim for subsequent determination. Plaintiff's claim thus went to the jury on these apparently conflicting factual theories,[9] with instructions to return answers to interrogatories rather than a general verdict. In response to the first interrogatory, the jury reported its finding that plaintiff had not established her claim of unseaworthiness in the manner contended. Judgment for South African was entered on this finding. As to the third-party claim (which was not rendered moot by the defendant's judgment in the main case because South African still might have been entitled to reimbursement for attorneys' fees), South African and ITO agreed to submit it to the court for a determination not inconsistent with the jury's verdict. In a memorandum and order filed June 17, 1974, the court found that 'the sole cause of Ianuzzi's death was a piece of lumber dropped upon him by one Andre. . . .' Accordingly, it dismissed the third-party claim.
 
 II. THE ISSUES ON APPEAL
 
 11
 Plaintiff contends that her negligence claim was erroneously removed from the jury's consideration. She apparently concedes that the proof was deficient if she was required to show notice of the specific defect that caused the accident. She argues, however, that such a requirement is an improperly strict statement of the law: In her view, the shipowner was under a duty to stop using the winches because of the complaints that had been made, and it would have been proper for the jury to find negligence in the event such a duty was breached, even though it might not be able to find that the defective condition complained of was the defective condition that caused the accident.[10] South African disputes plaintiff's contention as a question of law, and further makes what is essentially a harmless error argument: Even if the negligence issue should have gone to the jury, a finding of negligence would have been impossible in light of the finding on the unseaworthiness claim.
 
 
 12
 We would hesitate to affirm on the latter ground. There may be some authority in our decisions for this 'harmless error' rationale, Spano v. Koninklijke Rotterdamsche Lloyd, 472 F.2d 33, 35 & n. 1 (2d Cir. 1973) (per curiam), but we have also indicated our reluctance to require strict logical niceties in the functioning of the jury in our trial system. Henry v. A/S Ocean, 512 F.2d 401, at 405--406 (2d Cir. 1975). While it may be difficult for a lawyer or a judge 'to imagine, especially on the facts of this case, how an owner could be negligent, if the ship was not unseaworthy,' Spano, supra, 472 F.2d at 35 n. 1, we hesitate to confine the imagination of the jury within such narrow bounds. The jury may very well have a 'right to an idiosyncratic position,' Malm v. United States Lines, 269 F.Supp. 731 (S.D.N.Y.), aff'd on opinion below, 378 F.2d 941 (2d Cir. 1967) (per curiam), and we would not deprive it of that right here. Accordingly, we decline to base our decision on this ground.
 
 
 13
 We do, however, find merit in South African's objection to plaintiff's argument as a proposition of law. Plaintiff is really seeking to turn this into a res ipsa loquitur case, where negligence may be found even though the plaintiff is unable to show precisely what went wrong. But here, the winch was being operated by an employee of ITO, not of South African, and thus the 'control' element of res ipsa loquitur is lacking. Irwin v. United States, 236 F.2d 774, 776 (2d Cir. 1956). Since res ipsa loquitur is not involved, plaintiff's theory would require us to hold South African potentially liable in a situation where, assuming it breached a duty by continuing to operate the winches, the resultant accident was not within the scope of the risk foreseeably incurred by that breach of duty. This we decline to do. Notice of the particular defect causing the accident is necessary if a shipowner is to be held liable in negligence for failing to take defective equipment off the line. See, Rice v. Atlantic Gulf & Pacific Co., 484 F.2d 1318, 1320 (2d Cir. 1973).
 
 
 14
 As noted above, plaintiff appears to concede that there was a failure of proof on the question of notice, and she does not urge us to upset the district court's finding in that regard. Because of the importance of preserving factual issues for the jury, however, we have independently searched the record for any evidence that might have tended to establish notice. We find that this is the rare case where proof was so entirely lacking on that essential element of plaintiff's case that the district court's ruling need not be disturbed, even though it is normally preferable to put the issue to the jury under appropriate instructions and with specific interrogatories.
 
 
 15
 In light of our disposition of plaintiff's appeal, there is no occasion to consider South African's protective cross-appeal.
 
 
 16
 Affirmed.
 
 
 
 [1]
 See, Turchio v. D/S A/S Den Norske Africa, O.G., 509 F.2d 101 (2d Cir. 1974)
 
 
 [2]
 These witnesses and Ianuzzi had all known each other since their boyhood days in Italy
 
 
 [3]
 In a pretrial deposition, Scotto had said that he had not actually seen the car strike Ianuzzi, but that he turned just in time to see him falling. When confronted with this inconsistency at trial, Scotto claimed a lack of memory with regard to his deposition testimony
 
 
 [4]
 By stating that this is a necessary element of plaintiff's claims, we by no means indicate that it is sufficient
 
 
 [5]
 The manual controls operated the winches by means of separate hydraulic systems, referred to as the main systems. The hydraulic systems linking the remote with the manual controls were called the remote systems. Since the remote systems are designed to enable the winchman to govern the operation of the manual controls by using the remote controls, the remote systems are also referred to as 'master' systems, and the main systems as 'slave' systems
 
 
 [6]
 There is no testimony that air in the system by itself could cause the winch to run free, and no claim of notice of any such running on any other occasion
 
 
 [7]
 South African objected to this opinion on the ground that Ferenczy's assumed response of the winchman was inconsistent with Coppola's testimony as to what he actually did with the handles at the time of the accident
 
 
 [8]
 The record contains no indication of the relationship between New Jersey Export Marine Carpenters, Andre's employer, on the one hand, and South African and/or ITO on the other
 
 
 [9]
 A careful reading of the transcript may support a theory of the facts which resolves the apparent contradictions in the testimony
 First, the testimony that Ianuzzi was actually struck by the car might be discounted to some extent. Garofala was standing directly beneath Ianuzzi, and probably would not have been able to tell if the car struck him, brushed him lightly (or perhaps just caught his clothes), or did not actually hit him at all but rather simply caused him to lose his balance and fall while attempting to duck. And Scotto's testimony as to the actual striking is undermined by his prior deposition testimony. See, note 3, supra.
 Second, to say that Ianuzzi was on the upper 'tween deck all the time is wholly unsubstantiated by the evidence. No one was able to place him there, and Garofala, who clearly was on the upper 'tween deck, testified unequivocally that Ianuzzi was in fact on the main deck. Even Andre testified that Ianuzzi was on the main deck just prior to the accident.
 Third, Andre's admission might be qualified by the facts that neither he nor anyone else testified that they actually saw the lumber hit anybody, and that he was unaware when he looked back down in the hold that the injured party was Ianuzzi. This latter factor is important because of Andre's testimony that Ianuzzi had been on the main deck: Had he realized that it was Ianuzzi who was injured, he might not have been so quick to assume that the injury was caused by the falling lumber. In addition, it must be remembered that it was the swinging car that knocked the lumber out of Andre's hands; thus, if Ianuzzi fell because of the swinging car, he would have fallen at precisely the same time that Andre dropped the lumber. If Andre did not see the fall, this temporal coincidence probably reinforced his belief that the lumber caused the injury.
 Fourth, Ianuzzi lingered for several days in a hospital before he died, and the cause of injury on the hospital records was based on what Andre told the hospital staff. Thus, when Dr. DiMaio commenced his autopsy, he had before him a hospital report stating that the cause of injury was lumber falling on Ianuzzi's head. The autopsy report simply confirmed that the injuries were compatible with this cause; it did not purport to be a completely independent finding. And Dr. DiMaio did admit that if Ianuzzi had fallen upside down--a position consistent with Garofala's testimony that Ianuzzi was leaning over the coaming--and landed on his head, he could have received injuries similar to those actually observed.
 Putting these factors together results in the following possible theory: Ianuzzi was on the main deck, and was leaning over the coaming. When the car swung, either it struck him lightly or he lost his balance trying to duck. He fell down the hatch head first, receiving a fractured skull as his only injury. Andre did not see Ianuzzi fall, and when he realized that someone was hurt it was natural for him to assume that it was because of the lumber he dropped. He told this to the police and the hospital staff, and this version of the accident found its way into the medical reports, coloring the ultimate conclusion of the autopsy report.
 While this is a possible theory, we do not mean to imply that any verdict should have been directed, or that any factual finding of the district court was clearly erroneous. Such a ruling would be inappropriate considering the confusion in the record.
 
 
 [10]
 South African argues that plaintiff is barred from raising this argument here because she failed to raise it in the district court. While the argument may not have been made in these precise terms, the parties and the court did discuss the question of notice in some detail, and this argument is sufficiently related to those raised in the district court that to bar plaintiff from raising it here could be justified only by too great a dedication to technicalities