**Margaret E. VAUGHN**

v.

**MARINE TRANSPORT LINES, INC.**

**Civ. No. JFM–87–1656.**

United States District Court,
D. Maryland.

Oct. 18, 1989.

John Amoto, IV, Goodman, Meagher & Enoch, Baltimore, Md., for plaintiff.

John Nagle, III, Power and Mosner, Towson, Md., George Adams, R. Thomas Radcliffe, Jr., Tydings and Rosenberg, Patrick Smith, Whiteford, Taylor & Preston, Kieron Quinn, Kathryn Goldman, Quinn, Ward & Kershaw, P.A., A. Douglas Owens, Baltimore, Md., Richard Lerch, Lerch and Huesman, Michael Mann, Mann and Whelley, P.A., Towson, Md., James Eyler, Miles and Stockbridge, Baltimore, Md., H. Emslie Parks, Parks, Hansen & Ditch, Towson, Md., Rodger Robertson, Curran–Owens

Building, James Bartlett, III, Wilson, Elser, Moskowitz, Edelman & Dicker, Baltimore, Md., for defendant.

## OPINION

MOTZ, District Judge.

This case raises far-reaching issues concerning (1) the responsibility of manufacturers of asbestos products (and manufacturers of equipment containing asbestos) to undertake the defense of an unseaworthiness claim brought against a shipowner by a seaman suffering from an asbestos-related disease, and (2) the effects upon a manufacturer of a settlement between the seaman, the shipowner and other manufacturers.[1]

### I.

Bernice Vaughn was a Jones Act seaman who worked for most of his career as a fireman/watertender, engineman, oiler and wiper on various vessels owned by U.S. Flag shipowners. During the course of his work he was exposed to asbestos in the engine rooms and boilers of the vessels on which he served. He died of mesothelioma, and his wife, on her own behalf and as personal representative of his estate, brought suit against the owners of the vessels on which he had worked. Plaintiff asserted against the Shipowners both an unseaworthiness claim and a claim under the Jones Act.

The Shipowners impleaded as third-party defendants manufacturers of asbestos products and boilers (containing asbestos insulation) which had been used on their ships. In their third-party claims the Shipowners sought indemnification for their potential liability on plaintiff's unseaworthiness claim, and they simultaneously tendered defense of that claim to the third-party defendants. Pursuant to Fed.R.Civ.P. 14(c), the Shipowners also demanded judgment in favor of plaintiff against the third-party defendants.

Prior to trial, plaintiff settled with the Shipowners and all of the third-party defendants, except Foster Wheeler Corporation (one of the boiler manufacturers), for $316,500. The Shipowners of vessels on which Foster Wheeler boilers were located contributed $54,883.17 of the amount. The releases given by plaintiff to the Shipowners and the third-party defendants contained no provision releasing Foster Wheeler from liability. On the day that the trial was scheduled to begin, Foster Wheeler itself settled with plaintiff and obtained from her a release of all of her claims against it.

A non-jury trial was then held on the indemnification claim of the Shipowners whose vessels had contained Foster Wheeler boilers against Foster Wheeler for the $54,883.17 which they had contributed to the settlement with plaintiff and for $18,000 in attorneys' fees which they had incurred in defense of plaintiff's claims. On March 31, 1989, after hearing several days of testimony, this Court rendered an oral opinion in which it found that the presence of asbestos insulation in the Foster Wheeler boilers on the ships in question caused them to be unseaworthy. The Court further found that Foster Wheeler had not proved its allegation that the Shipowners negligently increased seamen's exposure to asbestos by (1) improper operational practices which caused the boilers to be repaired more frequently than would otherwise have been necessary, and (2) performing repairs of the boilers at sea which should have been performed in shipyards. These findings are hereby confirmed. An additional finding is hereby made, based upon the evidence presented at trial, that the amount which the Shipowners paid to plaintiff in settlement of her claims against them was reasonable.

After trial the Court gave the parties, including the third-party defendants who previously had settled with plaintiffs but

---

1. This Court rendered an opinion on July 31, 1989, which both sides asked be reconsidered. The present opinion, in effect, grants the Shipowners' motion for reconsideration and denies Foster–Wheeler's motion for reconsideration.

However, to avoid the unnecessary prolixity which would be caused by issuing a separate opinion on the motions for reconsideration, the Court will simply withdraw its original opinion and substitute this one in its stead.

whose interests (both in this and future litigation) might be affected, an opportunity to submit briefs on the legal issues presented.

## II.

■ The first question which must be decided concerns the elements of the Shipowners' indemnity claim against Foster Wheeler. The Shipowners contend that in order to prevail on that claim, they need establish only three facts: first, that they were potentially liable to plaintiff, *see, e.g., Burke v. Ripp*, 619 F.2d 354 (5th Cir.1980); *Parfait v. Jahncke Service, Inc.*, 484 F.2d 296 (5th Cir.1973), *cert. denied, Ruppel v. Travelers Indemnity Co.*, 415 U.S. 957, 94 S.Ct. 1485, 39 L.Ed.2d 572 (1974); *Damanti v. A/S Inger*, 314 F.2d 395, 397 (2d Cir.1963), *cert. denied, Daniels & Kennedy, Inc. v. A/S Inger*, 375 U.S. 834, 84 S.Ct. 46, 11 L.Ed.2d 64 (1963); second, that Foster Wheeler's boilers containing asbestos contributed to their potential liability, *see Maritime Overseas Corp. v. United States*, 608 F.2d 1260, 1261 (9th Cir.1979); and third, that their settlement of the potential liability was reasonable. *See Molett v. Penrod Drilling Co.*, 826 F.2d 1419, 1429 (5th Cir.1987), *reh'g denied*, 878 F.2d 829 (5th Cir.1989); *Parfait v. Jahncke Service, Inc.*, 484 F.2d 296; *Jennings v. United States*, 374 F.2d 983, 987 (4th Cir.1967). Foster Wheeler argues, on the other hand, that the Shipowners must, in effect, step in the shoes of plaintiff and prove, *inter alia*, that exposure to the asbestos in Foster Wheeler boilers was a substantial factor in causing Vaughn's mesothelioma. *See Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162 (4th Cir.1986).[2]

The Shipowners' position is correct. Maritime law unquestionably applies to this case, *see generally East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 863–64, 106 S.Ct. 2295, 2298, 90 L.Ed.2d 865 (1986); *Swogger v. Waterman Steamship Corp.*, 136 Misc.2d 410, 518 N.Y.S.2d 715 (1987), *aff'd*, 546 N.Y.S.2d 80 (N.Y.A.D.1989); *compare Oman v. Johns–Manville Corp.*, 764 F.2d 224 (4th Cir.1985), *cert. denied*, 106 S.Ct. 351, 88 L.Ed.2d 319 (1985), and admiralty courts have traditionally invoked rules of indemnity to impose liability upon the party ultimately responsible for the commission of a wrong. *Ryan Stevedoring Co. v. Pan–Atlantic S.S. Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), is a classic embodiment of that principle.[3] There, a longshoreman injured by shifting cargo improperly stowed by a stevedore sued the shipowner for unseaworthiness. The shipowner in turn sued the stevedore for indemnity under a maritime warranty of workmanlike performance. Analogizing that warranty to a manufacturer's warranty of the fitness of its product, the Supreme Court held that the indemnity claim should be sustained so that liability would rest with the party best-suited to take preventive steps and reduce the likelihood of injury. *Ryan*, 350 U.S. at 133–34, 76 S.Ct. at 237; *see also Italia Societa Per Azioni di Navigazione v. Oregon Stevedoring Co.*, 376 U.S. 315, 324, 84 S.Ct. 748, 754, 11 L.Ed.2d 732 (1964).

The Shipowners do not contend that the precise holding of *Ryan* governs here. This case involves an indemnity claim founded on strict products liability, not the breach of a warranty of workmanlike per-

**2.** Although the parties have extensively briefed the issue, this is not an appropriate case in which to determine whether the *Lohrmann* rule of substantial causation applies in maritime asbestos litigation. However, nothing in this opinion is meant to suggest that a shipowner (or a manufacturer who has accepted the tender of a shipowner's defense on an unseaworthiness claim) may not argue that a seaman's length of service on its ship(s) was so short that plaintiff's proof of causation fails. Likewise, in defending a claim asserted against it by a seaman, a manufacturer might be able to prevail by arguing that

plaintiff's exposure to its products was only incidental and lacked substantial causative effect.

**3.** The result in *Ryan* was overruled by the Workers' Compensation Act Amendments of 1972. *See* 33 U.S.C. § 905 (1986). However, the indemnity analysis used by the Court in *Ryan* remains sound. *See, e.g., Lockheed Aircraft Corp. v. United States*, 460 U.S. 190, 103 S.Ct. 1033, 74 L.Ed.2d 911 (1983); *International Surplus Lines Ins. Co. v. Marsh & McLennan, Inc.*, 838 F.2d 124 (4th Cir.1988).

formance. However, the same broad principle of indemnity does apply. Although a shipowner's duty to maintain its vessel in a seaworthy condition is non-delegable and may be breached regardless of the shipowner's own fault, where the condition of unseaworthiness has been caused by a third party it is that party who should be made to bear the ultimate responsibility for any damage or injury caused by the vessel's unseaworthiness. This is as equally true in cases where the third party has created the condition of unseaworthiness by manufacturing and/or supplying a defective product for use on the vessel, as it is in cases like *Ryan* where the third party has provided an unworkmanlike service. *See, e.g., Marathon Pipe Line Co. v. Drilling Rig Rowan/Odessa,* 761 F.2d 229 (5th Cir.1985); *Vollmar Bros. Construction Co. v. Archway Fleeting & Harbor Service, Inc.,* 596 F.Supp. 112 (E.D.Mo.1984), *aff'd, Azalea Fleet, Inc. v. Dreyfus Supply & Machinery Corp.,* 782 F.2d 1455 (8th Cir.1986).

### III.

Foster Wheeler cites *Smith & Kelly Co. v. S/S Concordia Tadj,* 718 F.2d 1022 (11th Cir.1983), for the proposition that *Ryan*—type indemnity should not be permitted where the injuries to a seaman occurred at sea. In *Smith & Kelly* the Eleventh Circuit did broadly state that it would decline to apply *Ryan* to such a case. However, a review of the facts in *Smith & Kelly* demonstrates that what was critical to the court's holding was not the situs of the injury but the substantial responsibility which the shipowner bore for the seaman's injuries. It had failed to replace a defective hatch cover after having been given notice of its dangerous condition and ample opportunity to effect the necessary repairs. Although the stevedore had likewise been at fault by leaving the hatch in a dangerous condition after the completion of unloading operations, the court found that the shipowner had stood in at least as equal a position to have prevented the accident. Therefore, it found inapplicable under the facts presented the fundamental principle underlying *Ryan:* placing liability where responsibility ultimately lies.

The present case is quite different. The underlying premise of the doctrine of strict products liability is that it is the manufacturer who is in the best position to prevent any risk of unreasonable dangerousness inherent in a product's use. That premise is factually apposite here. Foster Wheeler was in the position to decide what materials to use to insulate its boilers. Whatever the respective responsibilities may have been between Foster Wheeler and the companies which manufactured and supplied the asbestos products to it, as between Foster Wheeler and the Shipowners, it was the former who could have better adopted the preventive measures required to reduce the likelihood of injury.

This is not to say that in every case a shipowner may automatically pass through its potential liability on an unseaworthiness claim to the manufacturer who supplied an allegedly defective product to its ship. Although claims for unseaworthiness and the manufacture of unreasonably dangerous products both fall under the rubric of "strict liability," the elements of the two claims are not perfectly coincident with one another. For example, a strict products liability claim will fail if the product in question was not being used for its intended purpose. Thus, if a shipowner made its vessel unseaworthy by using a product for something other than its intended purpose, it would be liable to a seaman injured by the product without having a carry-over claim against the manufacturer. Such a case would be analogous to those in which it has been held that a shipowner whose own negligence prevented a stevedore from fulfilling its warranty of workmanlike performance does not have an indemnity claim against the stevedore for injuries sustained by a longshoreman during cargo operations. *See Weyerhaeuser Steamship Co. v. Nacirema Operating Co.,* 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958); *Turner v. Global Seas, Inc.* 505 F.2d 751 (6th Cir. 1974).

 Nothing in the record of the present case indicates, however, that the Ship-

owners used the boilers manufactured by Foster Wheeler for anything other than their intended purpose. Foster Wheeler did attempt to establish at trial that the Shipowners may have exacerbated the condition of unseaworthiness by operational practices which caused undue damage to the boilers and by performing an excessive number of boiler repairs at sea, thereby increasing the exposure of seamen to asbestos in the boilers. However, even if Foster Wheeler had presented sufficient evidence to substantiate its allegations, its proof would have fallen far short of demonstrating that the boilers had not been put to their intended use. The fact that the boilers on an ocean-going cargo vessel would be subjected to hard and continuous use was entirely foreseeable at the time that they were manufactured. Thus, it was the duty of Foster Wheeler to manufacture the boilers to make them reasonably safe under those anticipated conditions of strenuous use, and, as a matter of admiralty law, this duty was non-delegable. *Cf. Oglebay Norton Co. v. CSX Corp.*, 788 F.2d 361, 366 (6th Cir.1986), *cert. denied*, 479 U.S. 849, 107 S.Ct. 173, 93 L.Ed.2d 109 (1986) (wharfinger who breached warranty of workmanlike performance by providing unsafe dock cannot assert as a defense in an indemnity action the ship captain's negligence in docking under poorly lighted conditions).[4]

### IV.

### A.

The next issue requiring resolution is the extent to which, if at all, Foster Wheeler's liability to the Shipowners should be re-

duced by virtue of the settlements reached between the Shipowners and other boiler and asbestos manufacturers. The Restatement (Second) of Torts provides a sound framework for analysis of that issue. Comment m to Section 886A indicates that there are three alternative approaches which have been taken to the question of the effect of a settlement between a plaintiff and a defendant upon the respective rights and liabilities of the settling defendant and any non-settling defendants.[5] Restatement (Second) of Torts § 886A Comment m (1977). Briefly summarized, these approaches are as follows:

(1) The settlement with a defendant extinguishes the plaintiff's claims against that defendant and the amount received by the plaintiff in settlement is credited against his claims against the non-settling defendants. However, the settlement has no effect on the non-settling defendants' cross-claims against the settling defendant for contribution.

(2) The settlement with a defendant extinguishes not only the plaintiff's claims against that defendant but also any cross-claims which non-settling defendants have against the settling defendant for contribution.

(3) The settlement with a defendant extinguishes the plaintiff's claims against that defendant, and the plaintiff's claims against non-settling non-defendants are diminished by the equitable share of the settling defendant. However, the cross-claims of the non-settling defendants against the settling defendant for contribution are themselves extinguished by the settlement.

---

4. As a secondary position, Foster Wheeler argues that a portion of the amount which the Shipowners paid in settlement must be deemed to be attributable to the Jones Act claim asserted by plaintiff for which the Shipowners are not entitled to indemnity from Foster Wheeler. The fallacy in this argument is that counsel for the Shipowners has represented that, in fact, no portion of the settlement payment made by the Shipowners was attributed to the Jones Act claim. That position is self-evidently reasonable. The only damages claimed by plaintiff are associated with Vaughn's mesothelioma which was caused by his exposure to asbestos products, not by any other condition created by

the Shipowners' alleged negligence. Thus, any Jones Act claim which plaintiff had against the Shipowners necessarily was subsumed within her unseaworthiness claim for which the Shipowners were strictly liable.

5. Here, of course, since the question arises in the context of the Shipowners' third-party claims, the Shipowners are to be considered as the "plaintiff," all of the manufacturers other than Foster Wheeler as the settling defendants and Foster Wheeler as the non-settling defendant.

As explained in the Restatement, each of these approaches has its own advantages and disadvantages. In the abstract the first may be considered the fairest. However, it has the distinct disadvantage of discouraging settlements because it does not permit a settling defendant to establish the final amount of its liability by the settlement. The second approach, cures this "disincentive to settlement" problem. However, it could lead to an unfair result if the plaintiff settled for a relatively small amount with a defendant who was highly culpable, leaving a relatively non-culpable defendant with the risk of paying more than its equitable share of the damages. The third approach, while extinguishing the non-settling defendant's cross-claims against the settling defendants, solves this "inequitable share" problem by permitting the non-settling defendant to litigate in the trial of plaintiff's own claim against it the question of its equitable share of the liability. As noted in the Restatement, however, this approach may unfairly prevent the plaintiff from entering into a settlement with a defendant of limited financial resources (or with limited insurance coverage) whose equitable share of the liability is substantial.

In light of the respective advantages and disadvantages of the three approaches, it cannot be said that any of them is inherently preferable to the others. Rather, that question must be resolved in the context of the particular circumstances presented by a particular type of case. Here, the second approach is clearly the most appropriate for three reasons.

First, this is the type of case in which the disincentive to settlement presented by the first approach must be avoided. The settlement between the Shipowners and the asbestos and boiler manufacturers other than Foster Wheeler was made in the context of the overall settlement reached between Mrs. Vaughn, the Shipowners and the manufacturers. Clearly, a person standing in the position of Mrs. Vaughn should not be deprived of the benefit of a settlement which she believes to be in her interest simply because one of the manufacturers chose not to participate in it. That, however, might well be the result if the settling defendants were unable to establish their final liability through their settlement but remained subject to cross-claims filed against them by a non-settling defendant against whom the plaintiff might obtain a verdict substantially larger than the settlement amount.[6]

Second, although the specific problem mentioned in the Restatement with the third approach—putting a plaintiff at risk for settling with a defendant of limited financial resources but with a relatively high degree of culpability—is not of concern here, two other considerations dictate against following that approach. If Foster Wheeler were permitted to litigate the extremely complex question of the relative culpability of all of the asbestos and boiler manufacturers in defending against the Shipowners' claim, the high cost of that litigation would provide a strong disincentive for the Shipowners to enter into settlements either with the other manufacturers or with the plaintiff. Furthermore, the public interest would be seriously harmed by requiring the substantial expenditure of limited judicial resources to resolve the wholly ancillary relative culpability question after the plaintiff herself had already been compensated through a settlement which she found acceptable.

Third, the only problem which the second approach might cause in some contexts— encouraging collusion between the plaintiff and the settling defendant—can be easily avoided here by a modification to the approach (adopted in some jurisdictions by case law or statute) subjecting the settle-

---

6. Here, of course, Foster Wheeler itself finally settled with Mrs. Vaughn before trial. However, at the time the overall settlement was made, Foster Wheeler's co-defendants did not know that it would do so. Moreover, to permit a defendant to benefit from such a last-minute settlement would (1) give it unfair leverage over the plaintiff (who might, as Mrs. Vaughn did here, decide that the cost of trial would not justify pursuing a claim against only one remaining defendant), and (2) provide a disincentive for a defendant to be reasonable in assuming an equitable share of the liability in negotiation with its co-defendants.

ment to judicial review of its *bona fides.*[7] *See* Restatement, § 886A comment m; *Commercial Cleaning Corp. v. Allied Chemical Co.,* 206 Cal.App.3d 1066, 254 Cal.Rptr. 401 (1988). This review provides fully adequate protection to a party standing in the position of Foster Wheeler against the possibility of having unfair leverage exercised against it during the course of the settlement negotiations.

### B.

■ Under the second Restatement approach thus being adopted, Foster Wheeler is not entitled to any reduction in the amount of its liability to the Shipowners if the settlement between the Shipowners and the other manufacturers was entered into in good faith.[8] The record fully establishes that it was. The payments to be made by the various defendants were based upon a formula used in the settlement in an earlier case of similar nature. Sixty-five percent of the settlement was to be paid by the asbestos manufacturers and 35% was to be paid by the Shipowners. The Shipowners, in turn, were to be reimbursed by the three boiler manufacturers (Foster Wheeler, Combustion Engineering and Babcock and Wilcox) to the extent of 8% of the settlement proceeds, reducing the Shipowners' own contribution to 27%. The percentage to be paid by each of the boiler manufacturers was to be determined by the number of sea days which Vaughn had served on

ships containing boilers manufactured by them. If Foster Wheeler had agreed to the settlement, this calculation would have resulted in Foster Wheeler contributing 4% to the settlement, and Combustion Engineering and Babcock and Wilcox each contributing 2% to the settlement.

Foster Wheeler did not believe that this formula was entirely fair to it, and it may be assumed that it made its objections in good faith. However, the question which is dispositive here does not concern Foster Wheeler's own good faith but the good faith of the Shipowners and the other manufacturers. The formula, which had precedent in the prior case, was accepted not only by the Shipowners and the asbestos manufacturers but by the other two boiler manufacturers, and it is reasonable on its face. Accordingly, Foster Wheeler is not entitled to any reduction in the amount which the Shipowners seek against it here.[9]

### V.

■ Foster Wheeler makes the further contentions that its liability to the Shipowners has been extinguished by (1) the release which it obtained, as part of its eventual settlement with plaintiff, of all of her claims against it, and (2) the Shipowners' failure to obtain, as part of their settlement with plaintiff, a release of her claims against Foster Wheeler. These contentions arise out of the same fundamental misconception of the nature of the Ship-

7. As the Restatement notes, in some cases this modification may itself cause the problem of providing at least some disincentive to settlement because it makes a settlement subject to the uncertain outcome of judicial review. Here, however, because the settlement was reached after substantial negotiation between numerous experienced lawyers and corporate litigants against the background of prior similar litigation, judicial approval of the settlement could be reasonably expected by the parties. In any event, the Shipowners have fully endorsed judicial review of the settlement here.

8. Foster Wheeler argues that principles of contribution law aside, it is entitled to a *pro rata* reduction in its share of liability by virtue of a provision in the settlement agreement between the Shipowners and the other manufacturers that "any verdict rendered against the other alleged tortfeasors shall be automatically reduced by the pro rata shares of the Releasees

fees herein." Foster Wheeler cites that language out of context, however. The preceding clause of the agreement establishes that it applies only "in any action in which the said Releasees are or may be a Defendant or additional Defendants." Since under the second Restatement approach being adopted here the settlement extinguished any claims which Foster Wheeler might have had against the other manufacturers, they could not be made "defendants or additional defendants" in this case. It might also be noted incidentally that it is only under the first Restatement approach that Foster Wheeler's cross-claims would not have been extinguished, and Foster Wheeler has not been able to cite a single admiralty case in which the first approach has been adopted.

9. It should be noted that, as indicated earlier in the text, the only Shipowners pursuing the claim against Foster Wheeler were those whose vessels contained Foster Wheeler boilers.

owners' indemnity claim which flaws Foster Wheeler's earlier arguments.

The fact that plaintiff released Foster Wheeler of her claims against it is entirely immaterial because the Shipowners are asserting their own independent claim against Foster Wheeler, not a derivative claim on behalf of plaintiff. Similarly, the fact that the Shipowners did not obtain a release from plaintiff of her claim against Foster Wheeler is of no consequence because, as to the unseaworthiness claim, the Shipowners were not potential joint tortfeasors. To the contrary, insofar as the unseaworthiness claim is concerned, the Shipowners, while subject to a claim of unseaworthiness by plaintiff, had their own claim against Foster Wheeler for making their vessels unseaworthy. In making a payment to settle the plaintiff's unseaworthiness claim against them, they acquired the right to obtain indemnity from Foster Wheeler in their own right, and they were free to pursue that claim regardless of the status of plaintiff's claims against Foster Wheeler itself. *See, e.g., Swogger v. Waterman Steamship Corp.*, 136 Misc.2d 410, 518 N.Y.S.2d 715 (1987); *Simpson Timber Co. v. Parks*, 390 F.2d 353 (9th Cir.1968), *cert. denied*, 393 U.S. 858, 89 S.Ct. 126, 21 L.Ed.2d 127 (1968); *cf. Sea–Land Service, Inc. v. American Logging Tool Corp.*, 637 F.Supp. 240 (W.D. Wash.1985).

A separate order will be entered herewith granting judgment in favor of the Shipowners against Foster Wheeler.

### ORDER

For the reasons stated in the opinion entered herein, it is this 18th day of October 1989

ORDERED that judgment is entered in favor of Amoco Oil Company, Farrell Lines, Inc., Gulf Oil Corporation, Keystone Shipping Company, Isco, Inc. and Texaco, Inc. ("Shipowners") against Foster Wheeler Corporation in the amount of $72,883.17.