**OGLEBAY NORTON COMPANY,**
Plaintiff-Appellant,
Cross-Appellee,

v.

**CSX CORPORATION,**
Defendant-Appellee,
Cross-Appellant.

Nos. 85–3069, 85–3093.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 30, 1986.

Decided April 14, 1986.

Richard C. Binzley and Harold W. Henderson argued, Thompson, Hine & Flory, Cleveland, Ohio, for Oglebay Norton Co.

Robert M. Anspach and Peter R. Silverman, argued, Toledo, Ohio, for CSX Corp.

Before KENNEDY and CONTIE, Circuit Judges, and GIBSON, District Judge.*

CONTIE, Circuit Judge.

This is a maritime action concerning liability for the death of a seaman. Oglebay Norton Company appeals from the magistrate's judgment, arguing that the magistrate erred as a matter of law in denying its claim for indemnity based on the defendant's breach of an implied warranty of workmanlike service; and, in the alternative, Oglebay argues that the magistrate's allocation of fault under a theory of contribution was clearly erroneous. Oglebay also argues that the magistrate abused his discretion in denying prejudgment interest and for failing to provide a rationale for his denial. The defendant, Chesapeake and Ohio Railway Company (C & O),[1] argues on cross-appeal that the magistrate erred in amending C & O's judgment to permit Oglebay recovery under a theory of contribution. For the reasons set forth below, we hold that Oglebay is entitled to indemnity as a matter of law as well as prejudgment interest. Accordingly, the issue of contribution need not be addressed.

## I.

On April 4, 1980, a violent storm passed through the Toledo-Oregon, Ohio region and caused a power outage at C & O's docks located in Oregon, Ohio. The steamer Sylvania, a 572-feet self-unloading carrier owned by Oglebay, was headed toward the C & O docks from Monroe, Michigan when the storm hit at about 5:00 p.m. Prior to the storm, Oglebay had received instructions from C & O to dock at the No. 3 coal dock. Attempts by Sylvania to contact C & O by radio after the storm were unsuccessful.

To reach the C & O docks, it was necessary to proceed down the Maumee Channel.[2] The Sylvania had been navigating the Maumee Channel for about one and one half hours when it received instructions from the C & O, via the Coast Guard, at about 7:30 p.m. to dock at the No. 2 coal dock rather than the No. 3 coal dock.

Shortly thereafter, Captain Scott on the Sylvania observed that there were no lights at the C & O docks. The Sylvania entered the No. 2 coal dock slip at about 7:40 p.m. with her lights on. Although it was dusk, it was not yet completely dark. The C & O was expecting her, and was aware of the approximate arrival time. The C & O's electricians had been unable to restore power to the dock and the dock was not

---

* The Honorable Benjamin F. Gibson, United States District Judge for the Western District of Michigan, sitting by designation.

1. Oglebay's complaint was filed against CSX Corporation (formerly Chessie System, Inc.), the parent corporation of C & O. The magistrate granted CSX's motion to substitute C & O, the actual owner of the dock.

2. The water outside the channel is too shallow for this size boat. The channel itself is only 500 feet wide, making it impossible to reverse the course of the Sylvania without entering a side channel or dock.

equipped with an emergency lighting system. The only lights provided, therefore, were the lights on the steamer Sylvania.

The No. 2 coal dock has a two-tier concrete design. The upper tier is the main dock. The lower tier is only three feet wide, and is approximately three feet below the upper tier. There are no ladders or hand rails between the two tiers. The mooring spiles are on the lower level, requiring a seaman to step from the upper to the lower tier to moor the vessel. From the lower tier, the concrete dock drops straight down into the water. When a vessel docks, it is flush with the wall since the entire face of the dock is concrete. It is not equipped with fenders or similar items to keep the boat away from the wall, ladders to enable a person to climb out, or recesses to enable a person to swim under the dock. Since this wharf is equipped with a coal unloading machine, coal would often accumulate on the dock.

When the Sylvania docked, there was considerable coal spillage since the C & O employees had not swept the dock of coal. Further, the dock and coal remained wet and slippery from the storm. The C & O did not provide illumination for the boat, despite the opportunity to do so and the availability of flashlights and car lights. The dock had about 20 crew members on hand who were apparently not occupied because of the power failure.

As the Sylvania pulled up to the dock, two seamen, Ralph Beckman and Orville Hill, were lowered from the vessel to the upper tier of the dock. Captain Scott did not request the assistance of the C & O dock hands, and they did not volunteer assistance. Beckman was in charge of the forward mooring cables which he carried at the same speed as the moving vessel for approximately 60 feet before he had to step to the lower level. He was not carrying a flashlight, but the boat's floodlight had been lighting his way. However, as the boat drew in closer to the dock, the lower level of the pier was darkened by a shadow, and no one was manning the floodlight

in order to change its angle to light Beckman's way. As this was transpiring, there was no assistance from the C & O dock hands; Captain Scott did not request assistance, and none was volunteered.

Beckman was directed by another deck hand, Hosko, to attach the cable to a particular dock spile on the lower tier. Hosko testified that he and Beckman were able to identify spiles despite the inadequate lighting. As Beckman stepped to the lower level he slipped or tripped and fell into the water between the concrete dock face and the vessel. Hosko yelled a warning, but Captain Scott was unable to reverse the ship's direction despite the use of bow thrusters and the attempted use of safety blocks. Beckman was crushed between the boat and the dock and was killed instantly.

Beckman's personal representative brought a wrongful death claim against Oglebay under the Jones Act, 46 U.S.C. § 688. Oglebay tendered the defense of this claim to the C & O, but the C & O rejected the tender. The claim was settled for $50,000, and Oglebay incurred $9,857.40 in attorneys' fees in the process.[3] Thereafter, Oglebay instituted this action against C & O to recover the expenses. In its complaint Oglebay sought indemnity or contribution over against C & O but litigated its claim to the court only on the indemnification theory.

The case was referred to a magistrate. The parties consented to having the magistrate enter a binding judgment with direct appeal to the court of appeals. The magistrate first ruled, on September 28, 1984, that maritime rather than state law controlled the case, relying on *Sims v. Chesapeake & Ohio Railway Co.*, 520 F.2d 556 (6th Cir.1975). The magistrate found that an "implied warranty of workmanlike performance" runs from a wharfinger to a shipowner which allows a shipowner to seek indemnification, and that this warranty had been breached by the C & O. The magistrate held, however, that indemnification was inappropriate because Captain

---

**3.** These amounts were stipulated as being rea-  sonable by both parties.

Scott was negligent in failing to provide adequate lighting or to anchor elsewhere until lighting was furnished, thereby proximately causing Beckman's death. He concluded that Scott was aware of the coal dock's dangers and was in a better position to avoid the injury than the wharfinger and his actions "precluded recovery" under the theory of indemnification. Since Oglebay had not argued its theory of contribution, the magistrate concluded that it was inappropriate to decide that issue.

Pursuant to Fed.R.Civ.P. 52(b) and 54(c) Oglebay moved to amend the judgment to include an award of contribution. The C & O opposed this motion, arguing that Oglebay had abandoned this claim and that the C & O would be prejudiced by the magistrate's consideration of it. The magistrate, however, ruled on December 14, 1984 that Oglebay had not abandoned its contribution claim, and that the C & O would not be prejudiced since no additional facts or evidentiary matters could, or would, have been offered by the C & O. He concluded that both parties were at fault and that applying a contribution theory would reduce the possibility of danger to other seamen. The magistrate held that Captain Scott was 75 percent to blame because he

"was in charge, and it was he who should have foreseen danger and acted, either by commanding his own men, seeking assistance from the defendant's employees, or declining to dock." The C & O was held to be 25 percent at fault since its employees had not "lent a hand." The total award was $12,500, which did not include interest, costs or attorneys' fees.

## II.

### A.

In *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the Supreme Court held that a stevedoring company, pursuant to a contract with the shipowner, had an implied warranty of workmanlike service to properly and safely stow cargo.[4] By the stevedore's failure to satisfy this warranty, the shipowner had a right to indemnification from the stevedoring company for loss resulting therefrom.[5] Since suing on the warranty is a contract action, the "concepts of primary and secondary or active and passive" negligence are irrelevant. *Id.* at 133, 76 S.Ct. at 237. Even though recovery may turn on the compa-

---

**4.** A contractual relationship, however, is not considered an essential element to imply this warranty. *See Waterman Steamship Corp. v. Dugan & McNamara, Inc.*, 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960).

**5.** A seaman who was employed by the stevedoring company had been injured while on the vessel. He therefore sued the owner of the vessel. By paying the seaman for his personal injuries, the ship sustained a loss which it was then able to recover from the stevedoring company. The action by the seaman against the vessel, brought under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 *et seq.*, was based upon the warranty of seaworthiness. Under *Ryan*, the employee was circuitously being reimbursed for his injuries by his employer because of the shipowner's remedy against the stevedoring company under the warranty of workmanlike service. The 1972 Amendments to the Longshoremen's Act provide that an injured employee may sue a vessel for its negligence, but the vessel may not recover this amount from the employer. These amendments, therefore, overrule *Ryan*,

insofar as they made an employer circuitously liable for injuries to its employee, by allowing

the employee to maintain an action for unseaworthiness against the vessel and allowing the vessel to maintain an action for indemnity against the employer. See H.R.Rep. No. 92–1441, pp. 4–8 (1972); S.Rep. No. 92–1125, pp. 8–12 (1972).

*Cooper Stevedoring Co. v. Fritz Kopke, Inc.*, 417 U.S. 106, 113 n. 6, 94 S.Ct. 2174, 2178 n. 6, 40 L.Ed.2d 694 (1974). However, the action in the instant case was brought under the Jones Act, and the individual injured was not an employee of the dock owner. There is no indication that the warranty of workmanlike service no longer exists, or that indemnity actions have been barred. Nor does the appellee in the instant case argue that this doctrine is no longer viable. Therefore, it appears that *Ryan* and its progeny continue to be valid precedent in this case. *But see Hurdich v. Eastmount Shipping Corp.*, 503 F.2d 397, 403 (2d Cir.1974) (since contribution is permitted in noncollision cases, the *Ryan* rule should give way to a more equitable sharing of loss); *Smith & Kelly Co. v. S/S Concordia Tadj*, 718 F.2d 1022, 1025–28 (11th Cir.1983) (refusal to expand *Ryan*).

ny's standard of performance, the action remains a contract, not tort, action. *Id.* at 133–34, 76 S.Ct. at 237. Further, the "shipowner's failure to discover and correct the contractor's own breach of warranty" is not a defense to indemnification. *Id.* at 134–35, 76 S.Ct. at 237–38.

In later cases, the Court has held that the warranty of workmanlike service can be breached and indemnity awarded even if the contractor has not acted negligently when furnishing latently defective equipment. *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.*, 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964). Since the stevedoring company provided the necessary equipment and had control over the loading and unloading of the ship and the supervision of such operations, the Court in *Italia Societa* noted that the stevedoring company "was in a far better position than the shipowner to avoid the accident." *Id.* at 323, 84 S.Ct. at 753. The Court stated that:

> [L]iability should fall upon the party best situated to adopt preventive measures and thereby to reduce the likelihood of injury. Where, as here, injury-producing and defective equipment is under the supervision and control of the stevedore, the shipowner is powerless to minimize the risk; the stevedore is not.

*Id.* at 324. *See also Henry v. A/S Ocean*, 512 F.2d 401, 406 (2d Cir.1975) (the doctrine of indemnity "serves to allocate risks among those segments of the enterprise best able to minimize the particular risk involved"). The Court also emphasized that the special rules governing maritime law were "designed to minimize the hazards encountered by seamen, to compensate seamen for the accidents that inevitably occur, and to minimize the likelihood of

such accidents." *Italia Societa*, 376 U.S. at 324, 84 S.Ct. at 754.

■ The warranty of workmanlike performance also runs from a wharfinger, or dock owner, to a shipowner. *Sims v. Chesapeake & Ohio Railway Co.*, 520 F.2d 556, 561 (6th Cir.1975); *Medomsley Steam Shipping Co. v. Elizabeth River Terminals, Inc.*, 354 F.2d 476 (4th Cir.1966); *Ammesmaki v. Interlake Steamship Co.*, 342 F.2d 627 (7th Cir.1965); *National Marine Service, Inc. v. Gulf Oil Co.*, 433 F.Supp. 913 (E.D.La.1977), *aff'd*, 608 F.2d 522 (5th Cir.1979); *Western Tankers Corp. v. United States*, 387 F.Supp. 487 (S.D.N.Y. 1975). In *Sims*, this court stated that:

> The nature of the services performed by the wharfinger determines the extent of this warranty.... The implied warranties of a wharfinger relate to the conditions of berths and the removal of dangerous obstructions or giving notice of their existence to vessels about to use the berths.... A wharfinger also owes a duty to furnish a safe means of egress and ingress to berthed ships.

520 F.2d at 561.[6] In *Ammesmaki*, 342 F.2d 627, 631 (7th Cir.1965), the wharfinger was held liable to indemnify the shipowner for an injury occurring on the dock since the wharfinger had breached its warranty "to maintain its dock in a reasonably safe condition."[7]

■ The magistrate found that the C & O had breached its warranty of workmanlike performance. In reaching this result, the magistrate applied the correct legal standard enunciated in *Sims*. Therefore, his finding of breach can be set aside only if clearly erroneous. Fed.R.Civ.P. 52(b). Neither party contends that the magistrate erred in this finding, and a quick review of the record reveals the reasonableness of

---

**6.** The court held that the warranty did not extend to all property owned by the wharfinger. Since the injury in *Sims* took place in a parking lot away from the pier, the warranty was not implicated.

**7.** Although not a warranty case, the Fourth Circuit in *Medomsley*, set out a wharfinger's duty as follows:

> It is well settled, of course, that a wharfinger is under a duty to exercise reasonable care to furnish a safe berth and to warn a ship of any unexpected hazard or deficiency known to the wharfinger, or which, in the exercise of reasonable care, he should have known.

354 F.2d at 480.

the magistrate's conclusion: the dock was strewn with wet coal, no emergency lighting was provided, the two-tier dock style and its sheer concrete face were inherently dangerous which was complicated by the lack of fendering, recesses or ladders.[8]

■ Having found that the wharfinger breached its warranty of workmanlike service which runs to a shipowner, indemnity may nonetheless be an inappropriate remedy. A shipowner is entitled to indemnity when a breach of the warranty of workmanlike performance results in loss, *"absent conduct on [the shipowner's] part sufficient to preclude recovery." Weyerhaeuser Steamship Co. v. Nacirema Operating Co.,* 355 U.S. 563, 567, 78 S.Ct. 438, 440, 2 L.Ed.2d 491 (1958) (emphasis added). Negligent conduct on the part of a shipowner is not necessarily sufficient to preclude recovery, since the recovery should not turn on active, passive, primary or secondary negligence. *Id.* at 568–69, 78 S.Ct. at 441–42.

In this circuit "conduct sufficient to preclude recovery" is "conduct which prevented or seriously hampered [a contractor's] performance of its duty in accordance with its warranty" of workmanlike service. *Turner v. Global Seas, Inc.,* 505 F.2d 751, 753 and 754 (6th Cir.1974).[9] Although the appellees have rigorously argued that *Turner* does not stand for this proposition, we disagree. The key to *Turner* is the weighing of fault with respect to the breach of the wharfinger's or stevedore's warranty of workmanlike service, rather than the weighing of fault with respect to the seaman's injury. Other circuits have similarly defined a shipowner's conduct which is "sufficient to preclude recovery." *See, e.g., Hanseatische Reederei Emil Offen & Co. v. Marine Terminals Corp.,* 590 F.2d 778, 782 (9th Cir.1979) (indemnity denied under *Weyerhaeuser* where shipowner's conduct "effectively prevents the stevedore from satisfying its implied warranty of workmanlike service");[10] *Henry v. A/S Ocean,* 512 F.2d 401, 407 (2d Cir. 1975) (recovery precluded "only where [the shipowner] prevented or seriously handicapped the stevedore in his effort to perform his duties"); *Le Blanc v. Two-R Drilling Co.,* 527 F.2d 1316, 1321 (5th Cir. 1976) (to deny recovery, focus on "whether conduct or circumstances of the condition for which Shipowner has a legal responsibility seriously impeded or prevented Contractor from performing the job in a safe and workmanlike manner").[11] *See also Commercial Union Insurance Co. v. M/V Bill Andrews,* 624 F.2d 643, 647 (5th Cir. 1980). *But see Western Tankers Corp. v. United States,* 387 F.Supp. 487, 491 (S.D. N.Y.1975) (a vessel's negligence is sufficient to preclude indemnity if it is "best situated to adopt preventive measures and thereby reduce a likelihood of injury ... for the dangers caused by the unsafe berth"); *Hurdich v. Eastmount Shipping Corp.,* 503 F.2d 397, 402 (2d Cir.1974) (who-

---

**8.** It should be noted that three seamen had been crushed in a similar fashion at the C & O docks on previous occasions, and the C & O docks are apparently one of the few docks on Lake Erie that fail to provide any of these safety features.

**9.** In *Turner,* steel billets had been improperly loaded onto the vessel. The stevedoring companies sought to correct the problem, but the ship refused, insisting to set sail despite the deficiency. Therefore, the shipowner prevented the stevedores from performing within their warranty.

**10.** In *Hanseatische* the Ninth Circuit stated that indemnity was owed to a shipowner if the shipowner does not prevent or seriously handicap the stevedore's fulfillment of its warranty; and even if the shipowner does handicap the stevedore, indemnity is not necessarily precluded.

590 F.2d at 783. The court focused primarily on whether the shipowner sought to recover for *"foreseeable* harms resulting from the breach." *Id.* at 781 (emphasis added). Since attorneys' fees and expenses were foreseeably incurred as a result of the stevedore's breach, these were also recoverable. *Id.* at 784.

**11.** In *Le Blanc,* the lower court erred by focusing on the shipowner's control over, and responsibility for, the equipment and operations, rather than focusing on the warranty for workmanlike performance. 527 F.2d at 1329. Similarly, in this case, the magistrate focused on the Captain's control over the seaman rather than the wharfinger's control over the dock.

ever is best situated to adopt measures to reduce likelihood of injury bears the loss).[12]

In the instant case, the magistrate focused on the relative fault of the parties rather than determining whether Captain Scott's conduct prevented or seriously hampered the C & O from performing in a workmanlike manner. The magistrate concluded that Captain Scott "was more able to reduce or avoid the apparent dangers," and held that under *Italia Societa*, "liabilities should fall upon the party best situated to adopt preventive measures and thereby to reduce the likelihood of injury." The magistrate noted that in *Turner* this court endorsed the jury's right to weigh "the substantiality of the fault of the shipowner against the breach of warranty to determine whether the shipowner's conduct was 'sufficient to preclude indemnity,' " *quoting Turner*, 505 F.2d at 756. The magistrate then concluded that "a claim for indemnity can be barred where the claimant-shipowner's own conduct proximately caused the loss which it suffered," and that "[b]y placing the loss on the party which could have prevented the loss, the policy of protecting crew members from risk of injury is furthered."

■■■ We believe that the test which the magistrate enunciated converts this contract action into a tort action by weighing comparative fault, precisely what *Ryan* and *Weyerhaeuser* cautioned against. Further, it ignores the nature of the wharfinger's warranty to maintain a safe berth and the wharfinger's control over the dock. Although Oglebay was in control of Beckman and the mooring, the C & O was under an obligation as to the shipowner to cure the dangerous conditions of the dock. The magistrate did state that Captain Scott " 'prevented the workmanlike performance' in the context of this case when he failed to act in a manner which would have made safe docking possible." However, his conclusion is clearly erroneous since there is no evidence that Captain Scott prevented the C & O from sweeping the coal, providing emergency lighting, or adding safety features to make the dock less dangerous. Although Captain Scott could have avoided the danger by refusing to dock, he did not prevent or hamper the wharfinger's "performance of its duty in accordance with its warranty" of workmanlike service. In the absence of such a showing, a shipowner's negligence does not prevent recovery under this theory of indemnity.

Therefore, we conclude that Oglebay is entitled to indemnity under the standards set forth in *Ryan, Weyerhaeuser* and *Turner*.[13]

**B.**

Oglebay sought, but did not receive, prejudgment interest. The magistrate did not address this issue, but simply awarded $12,500, or 25 percent of the $50,000 settlement.

In a seaman's action to recover for personal injury or death, the general rule is that interest is awarded "from the date that the damages have been judicially determined," and not prejudgment interest from the date of injury. *Cleveland Tankers, Inc. v. Tierney*, 169 F.2d 622, 626 (6th Cir.1948). *See also Petition of United States Steel Corp.*, 436 F.2d 1256 (6th Cir. 1970), *cert. denied*, 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 720 (1971). In contrast,

12. In *Hurdich*, the court of appeals decided who was best able to reduce the likelihood of injury by determining who had more control over the area where the injury occurred, rather than who had control over the person who was injured. These cases are inconsistent with the law in this circuit only to the extent that they fail to focus on how the shipowner's conduct affects the wharfinger's or stevedore's ability to perform within its warranty.

13. The C & O portrays this as an absurd result since a 75 percent negligent shipowner would be allowed to recover from a 25 percent negligent wharfinger. However, the magistrate's calculation of fault cannot be removed from his understanding of *Turner*. He calculated C & O's fault by its failure to offer aid to Captain Scott rather than the dangerous nature of the dock. Further, as previously noted, comparative fault has no meaning in an indemnity action. As long as the shipowner's actions do not prevent the wharfinger from performing within its warranty, then the shipowner can be indemnified.

where recovery for property damage is sought in an admiralty case, prejudgment interest is usually awarded "as compensation for the use of funds to which the claimant was rightfully entitled." *Noritake Co. v. M/V Hellenic Champion,* 627 F.2d 724, 728 (5th Cir.1980). In such cases, "[d]iscretion to deny prejudgment interest is created only when there are 'peculiar circumstances' that would make it inequitable for the losing party to be forced to pay prejudgment interest." *Id.* "Peculiar circumstances" is a broad exception, and it is a factual determination governed by the clearly erroneous standard. *Id.* at 729. If the trial judge does not make a finding of "peculiar circumstances," the appeals court may make such an inference particularly "when the record clearly discloses peculiar circumstances...." *Id.* However, if peculiar circumstances do not exist from the face of the record, the district court can be reversed for failing to award prejudgment interest. In such a case, the court of appeals has the power to modify the award, or remand to the trial judge for a calculation of interest. *Id. See also Todd Shipyards Corp. v. Turbine Service, Inc.,* 674 F.2d 401, 415 (5th Cir.), *cert. denied,* 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982); *Mid-American Transportation Co. v. Cargo Carriers, Inc.,* 480 F.2d 1071, 1074 (8th Cir.1973).

■ We believe that an admiralty indemnity claim is more analogous to a property damage claim since the amount at issue has been liquidated. Under such circumstances, the only question to be determined at trial is which party should bear the loss. If it is determined that a third party was obligated to pay, that individual should be required to reimburse the party who carried its burden absent peculiar circumstances. *See, e.g., N.M. Paterson & Sons, Ltd. v. Nicholson Cleveland Terminal Co.,* 323 F.Supp. 913 (N.D.Ohio 1971) (prejudgment interest awarded in indemnity case measured from date of shipowner's settlement payment). Since the magistrate did not articulate any reason for denying interest, and no peculiar circumstances are apparent from the record, interest is awarded from the date that Oglebay settled Beckman's wrongful death claim.

Accordingly, the magistrate's decision on the indemnity claim is REVERSED. The appellant is entitled to indemnity for the $50,000 wrongful death settlement and prejudgment interest from the date of settlement is awarded in favor of Oglebay. Further, since the magistrate did not state any reasons for denying attorneys' fees, we find that Oglebay is entitled to the $9,857.40 in attorneys' fees that was stipulated to as being reasonable. *See Hanseatische Reederei Emil Offen & Co. v. Marine Terminals Corp.,* 590 F.2d 778, 784 (9th Cir.1979); *Noritake Co. v. M/V Hellenic Champion,* 627 F.2d 724, 730–31 n. 5 (5th Cir.1980); *N.M. Paterson & Sons, Ltd. v. Nicholson Cleveland Terminal Co.,* 323 F.Supp. 913, 916 (N.D.Ohio 1971).