896 F.Supp. 1440 (1994)
Jane Ann GEYER, Personal Representative for the Estate of Jerold G. Geyer, Deceased, Plaintiff,
v.
USX CORPORATION (f/k/a "United States Steel Corporation"), Defendant, Cross-Plaintiff, and Third-Party Plaintiff,
v.
BABCOCK & WILCOX COMPANY, Babcock & Wilcox Company as Successor-in-Interest to Bailey Meter Company and Diamond Power Specialty Company, Defendant, Cross-Defendants, and Third-Party Defendants.
No. 92-CV-70075-DT.
United States District Court, E.D. Michigan, Southern Division.
November 28, 1994.
*1441 *1442 Baughman & Associates Co., L.P.A., R. Patrick Baughman, Susan S. Henderson, Sandra Becher Sommers, James A. Byrne, Cleveland, OH, for cross- and third-party plaintiff USX Corporation.
Thomas Marcucci, Troy, MI, for cross- and third-party defendants the Babcock & Wilcox Company, Bailey Meter Company, and Diamond Power Specialty Company.
Before WOODS, District Judge.
ORDER GRANTING CROSS- AND THIRD-PARTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO CROSS- AND THIRD-PARTY PLAINTIFF'S CLAIM FOR CONTRIBUTION, AND DENYING CROSS-AND THIRD-PARTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO CROSS- AND THIRD-PARTY PLAINTIFF'S CLAIM FOR INDEMNIFICATION
This matter having come before the Court on Cross- and Third-Party Defendants' Motion for Summary Judgment as to Cross- and Third-Party Plaintiff's claims for contribution and indemnification;
The Court having reviewed the pleadings submitted herein, including cross- and third-party plaintiff's response to cross- and third-party defendants' motion for summary judgment, cross- and third-party defendants' reply to cross- and third-party plaintiff's response, and being otherwise fully informed in the matter;
The Court finds that cross- and third-party defendants' motion for summary judgment shall be, and hereby is, GRANTED as to cross- and third-party plaintiff's claim for contribution, shall be, and hereby is, GRANTED as to cross- and third-party plaintiff's claim for indemnification based on vicarious liability, but shall be, and hereby is, DENIED as to cross- and third-party plaintiff's claim for indemnification based on potential contractual obligation.

*1443 I. INTRODUCTION AND FACTS
On January 7, 1992, Plaintiff, Jane Ann Geyer, personal representative for the Estate of Jerold G. Geyer ("Geyer") commenced an action in this Court[1] against United States Steel Corporation, n/k/a USX Corporation ("USX"), and manufacturers or suppliers of products allegedly containing asbestos, including The Babcock & Wilcox Company. Geyer sought to recover damages relating to the injury and subsequent death of her husband, a seaman who served on merchant vessels allegedly owned and/or operated by USX. The injuries allegedly stemmed from exposure to asbestos-containing products. Geyer asserted claims against USX for Jones Act negligence and unseaworthiness pursuant to this Court's admiralty jurisdiction. Geyer also asserted claims against the Babcock & Wilcox Company and other defendants for negligence, breach of implied warranty, concert of action, exemplary damages, and strict, enterprise, alternative, and absolute liability. USX later filed cross-claims and an amended third-party complaint against The Babcock & Wilcox Company, Diamond Power Specialty Company, and The Bailey Meter Company ("B & W"), asserting claims for strict liability, negligence, breach of warranty, intentional and/or negligent misrepresentation, indemnification, and contribution.
On June 25, 1994, a consent judgment was entered for Geyer against B & W for $5,000. On July 29, 1994, after the instant motion already had been filed, and pursuant to a previous settlement agreement, B & W and Geyer executed a Settlement Agreement, Covenant Not to Sue, Joint Tort Feasor Release and Indemnity Agreement ("release"). Pursuant to the release, B & W paid Geyer $5,000 in consideration for her covenant not to pursue any pending or potential claims against B & W based on her husband's exposure to asbestos in B & W's products. Geyer also agreed to indemnify B & W for up to $5,000 in the event that B & W is held liable in a cross- or third-party action seeking contribution or indemnity for a judgment resulting from the decedent's exposure to B & W's asbestos-containing products. B & W expressly denied any liability for the decedent's injuries. Further, Geyer expressly retained her rights against the other defendants remaining in the lawsuit.
On July 21, 1994, B & W filed the instant motion to dismiss, predicated upon the then-anticipated execution of the release. B & W attached to this motion a "sample copy" of the release, as well as the affidavit of David P. McKnight, the authorized representative of B & W and its insurers, stating that B & W and Geyer had entered into a settlement agreement and soon would execute the release. B & W later supplemented its original proofs with a copy of the executed release, a copy of a cancelled check in payment of B & W's obligation to Geyer, and a supplement affidavit of McKnight stating that Geyer was represented by her attorney at all times during negotiations with B & W, and that B & W has not entered into any other agreement with Geyer which would affect the executed release.
Because every claim asserted by USX against B & W is based upon the argument that B & W is responsible for any liability USX may have to Geyer, dismissal of USX's claims for contribution and indemnification therefore would dispose of all of USX's claims.

II. LEGAL STANDARD
B & W labelled their motion as a Motion to Dismiss and filed it pursuant to Fed.R.Civ.P. 12(b) and 14(a). Because B & W attached an affidavit to their motion, however, the Court, under Rule 12(b), will regard the motion as one for summary judgment.[2]
*1444 Pursuant to Fed.R.Civ.P. 56(c), a motion for summary judgment is to be granted only if the evidence indicates that no genuine issue of material fact exists. In order to avoid summary judgment, the opposing party must have set out sufficient evidence in the record to allow a reasonable jury to find for him at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Matsushita Electric Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The sufficiency of the evidence is to be tested against the substantive standard of proof that would control at trial. Anderson, supra. The moving party has the burden of showing that there is an absence of evidence to support the non-moving party's case. Celotex v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986). "[A] party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256, 106 S.Ct. at 2514. In disposing of a motion for summary judgment, this Court must consider the evidence in the light most favorable to the non-moving party, but may weigh competing inferences for their persuasiveness. Matsushita, supra.

III. ANALYSIS

A. The Claim for Contribution
Until quite recently, no legal consensus had emerged regarding the determination of a nonsettling defendant's precise liability or his ability to seek contribution against a fellow defendant who has settled with the plaintiff. McDermott, Inc. v. AmClyde, 511 U.S. ___, ___, 114 S.Ct. 1461, 1465, 128 L.Ed.2d 148 (1994). The Supreme Court, however, has dispelled much of the confusion in this area through two unanimous admiralty decisions decided earlier this year. See McDermott, supra, Boca Grande Club, Inc. v. Florida Power & Light Co., Inc., 511 U.S. ___, 114 S.Ct. 1472, 128 L.Ed.2d 165 (1994).
In McDermott, the Court held that a non-settling defendant's liability should be calculated with reference to jury's determination of that defendant's proportionate responsibility. McDermott, 511 U.S. at ___, 114 S.Ct. at 1463. The Court therefore adopted the "proportionate share" rule, whereby a plaintiff's judgment against a nonsettling defendant is reduced by the settling defendants' proportionate share of responsibility for the total judgment. Id. at ___-___, 114 S.Ct. at 1465-66. The Court noted that, under this approach, "no suits for contribution from the settling defendants are permitted, nor are they necessary, because the nonsettling defendants pay no more than their share of the judgment." Id. at ___, 114 S.Ct. at 1466. Further, the allocation of all parties' relative fault takes place at trial. Id. at ___, 114 S.Ct. at 1469.
The Supreme Court underscored McDermott's holding in Boca Grande, supra, a one-paragraph decision issued the same day as McDermott. In Boca Grande, the Court held that "in an action against several alleged joint tortfeasors under general maritime law, the plaintiff's settlement with one defendant bars a claim for contribution brought by nonsettling defendants against the settling defendant." Boca Grande, 511 U.S. at ___, 114 S.Ct. at 1472. This holding was necessitated by McDermott's adoption of the proportionate share rule, "under which actions for contribution against settling defendants are neither necessary nor permitted." Id.
Unless genuine issues of material fact exist concerning the existence or propriety of the settlement agreement itself, McDermott and Boca Grande therefore dictate that USX's contribution action against B & W is impermissible now that a settlement between Geyer and B & W has been reached. Any judgment awarded to Geyer against USX necessarily will be reduced by whatever proportion of fault that B & W is determined to share.
USX seeks to inject issues of material fact into the instant litigation by arguing that (1) B & W's original motion did not include any master settlement agreement, signed release, or cancelled check, thereby failing to fully reveal the particulars of the agreement, (2) B & W did not address in the release its status as a joint-tortfeasor or its proportion of fault, *1445 and (3) B & W has not established that the release was executed properly.

1. Existence and Details of the Settlement
USX's argument that B & W has failed to reveal all of the basic aspects of the settlement transaction may have been persuasive had B & W not supplemented the proofs accompanying its original motion. B & W attached to its original motion a "sample release," unsigned by Geyer, and an affidavit of the representative of B & W stating that Geyer soon would execute the release, pursuant to a previous settlement agreement, in exchange for B & W's payment of $5,000.
Pursuant to an order of this Court permitting B & W additional time to file documents in support of its motion, however, B & W supplemented its original proofs with (1) a copy of the release executed by Geyer, as witnessed by a notary public, (2) a copy of the cancelled check in payment of B & W's obligation to Geyer, and (3) a supplemental affidavit by B & W's representative stating that the copies of the executed release and cancelled check are true and accurate, that Geyer was represented by her attorney during all negotiations with B & W, and that B & W has not entered into any other agreement which would affect the terms of the executed release.
The executed release is clear and detailed. Undisputed proof of actual payment exists. No genuine issues of material fact therefore remain regarding the existence or details of the release.

2. B & W's Non-Admission of Joint-Tortfeasor Status
USX asserts that B & W's refusal to admit liability in the release has preserved the factual issue of B & W's tortfeasor status. USX argues that the release should contain a determination of such status, binding upon Geyer. USX further objects that the wording of the release may allow Geyer to avoid reduction of her recovery by allowing her to deny at trial that B & W is a joint-tortfeasor.
The fact that B & W's status as a tortfeasor continues to be an issue does not preclude summary judgment. Allocation of each parties' proportionate share of fault, if any, occurs at trial. McDermott, 511 U.S. at ___, 114 S.Ct. at 1469. It therefore was entirely permissible for Geyer and B & W to leave open the issue of B & W's tortfeasor status in their settlement agreement. Of course, B & W's denial of liability in the release does not preclude a finding that B & W was partially or even completely responsible for Geyer's damages. Although the settlement bars USX's contribution claim, USX simply cannot and will not be held accountable for any of B & W's share of fault. As B & W correctly notes, application of McDermott's preclusion of contribution claims against settling defendants is not dependent upon any particular apportionment of liability.[3]
Nor does the fact that the wording of the release allows Geyer to try to avoid reduction of her recovery by casting B & W as completely faultless at trial preclude summary judgment. Concern that Geyer could reap a "double recovery" by having settled (i.e., by winning a judgment at trial against nonsettling defendants that is unaffected by any prior settlements with defendants eventually determined to be faultless) overlooks the fact that Geyer's settlements also could render any judgment awarded to her worthless (this would happen if the settling defendants are determined to be entirely responsible). Just as B & W has run the risk of having settled too high, Geyer has run the *1446 risk of having settled too low. Geyer therefore is free at trial to cast B & W as faultless as possible, countered, no doubt, by USX's efforts to do the opposite.
Finally, B & W need not remain as a party to this case in order to facilitate USX's ability to litigate the various parties' proportionate share of overall fault. The McDermott Court clearly contemplated that settling defendants would not remain as parties, stating that reserving the apportionment of liability for trial appropriately will result in nonsettling defendants often arguing "the `empty chair' in the hope of convincing the jury that the settling party was exclusively responsible for the damage." Id. at ___, 114 S.Ct. at 1470 (emphasis added). Not retaining settling defendants as parties also furthers the larger policy objectives of McDermott: although equity concerns drove that case's holding, desires to curb litigation expenses, encourage settlement, and increase judicial economy also were at work. See id. at ___-___, 114 S.Ct. at 1466-70. Forcing settling defendants to remain as parties and litigate their proportion of liability fails to simplify litigation and discourages defendants from settling in the first place. See also Stanley v. Bertram-Trojan, Inc., 781 F.Supp. 218, 225-26 (S.D.N.Y.1991); Bordelon v. Consolidated Georex Geophysics, 628 F.Supp. 810, 812-13 (W.D.La.1986); Amerada Hess Corp. v. Owens-Corning Fiberglass Corp., 627 So.2d 367, 378 (Ala.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1610, 128 L.Ed.2d 338 (1994).[4]

3. Validity of the Release
USX contends that a genuine issue exists regarding the validity of Geyer's release. USX notes that the release does not recite the disease process or cause of death. USX further argues that the $5,000 in consideration paid for the release is inadequate, especially given B & W's alleged policy of paying $5,000 in settlement to every claimant representing a decedent's estate.
Generally, nonsettling defendants lack standing to object to a partial settlement. Waller v. Financial Corp. of America, 828 F.2d 579, 582-83 (9th Cir.1987). However, a nonsettling defendant may object to a settlement when it can demonstrate that it will suffer some formal legal prejudice as a result of the settlement. Id. at 583. A nonsettling defendant can suffer formal legal prejudice from a settlement which purports to strip the nonsettling defendant of an action for indemnity or contribution. Id. USX therefore has standing to object to B & W's settlement with Geyer.
USX correctly states that courts must determine whether a seaman's release was properly executed. The Fifth Circuit has explained that admiralty courts must
scrutinize a seaman's release to determine whether the seaman fully understood his rights and the consequences of the release. A release is not valid unless it has been executed without deception or coercion. If the [party objecting to the release] establishes a genuine issue of material fact concerning the validity of the procurement of the seaman's release, the issue is to be decided by the jury.
Durden v. Exxon Corp., 803 F.2d 845, 847-48 (5th Cir.1986) (citations omitted). The court's ultimate concern is not whether it believes that the seaman has received adequate consideration, but rather whether the seaman relinquished his rights under the circumstances described above. Bass v. Phoenix Seadrill/78, Ltd., 749 F.2d 1154, 1161 (5th Cir.1985). Adequacy of consideration is simply one factor in the determination of whether the seaman fully understood his rights and the effect of the settlement. Id. Other factors include whether the parties negotiated in good faith, whether there is the appearance of fraud or coercion, and whether *1447 the seaman was represented by counsel. Stipelcovich v. Sand Dollar Marine, Inc., 805 F.2d 599, 606 (5th Cir.1986).
As noted, USX asserts that a material issue of fact exists because the $5,000 settlement may not adequately reflect the strength of Geyer's claim against B & W. USX has not asserted, or at least has failed to demonstrate, the possible involvement of bad faith, coercion, fraud, or lack of counsel in the settlement proceedings. Although an evidentiary hearing is necessary when the propriety of the settlement proceedings has been attacked, Mid-South Towing Co. v. Har-Win, Inc., 733 F.2d 386, 390-92 (5th Cir.1984), such a hearing is unnecessary here, where the settlement agreement has been challenged solely on the basis of the value of the plaintiff's case on the merits. Id. This is because
[t]here would be little security in the settlement of a personal injury claim if the binding effect of such a settlement depended upon the certainty of the extent and outcome of the injuries involved. It is the very consequences of these uncertainties which the parties seek to foreclose by settlement and to take their chances on their outcome.
Id. at 392 (quoting Strange v. Gulf & South American Steamship Co., 495 F.2d 1235, 1237 (5th Cir.1974)). Likewise, the Supreme Court noted in McDermott that one of the strengths of the proportionality rule that it was adopting was that it conserved judicial resources by not requiring a good-faith hearing. McDermott, 511 at ___-___, 114 S.Ct. at 1467-70.
The record demonstrates that Geyer was represented by counsel and executed a clear and detailed release which retained her rights to pursue claims against other defendants and included a statement that she fully understood the terms of the settlement and accepted the $5,000 as a full and final compromise. See Exhibit 1, attached to B & W's October 17, 1994, Reply. Likewise, Geyer and B & W arranged to have a consent judgment between them entered on June 28, 1994. An examination of this case's docket further reveals that Geyer has settled with several other of the many defendants, and has done so for less money than with B & W.[5] These other settlements indicate that Geyer has not simply "thrown away" her entire case for $5,000, and that Geyer has settled knowing that B & W may share only a certain percentage of the entire burden of fault, if any at all. Finally, although USX has standing to challenge the release, concerns about its validity cannot help but be evaluated in light of the fact that it is not Geyer who challenges the release.
The Court further notes that the higher level of scrutiny applied to seamen's releases is partially, if not completely, based on the premise that "[t]he authoritarian relationship of shipowners and their representatives to seamen and the isolation of the latter from the legal, economic, and psychological support of a landbased community may put the seamen at a serious bargaining disadvantage." Capotorto v. Compania Sud Americana de Vapores, Chilean Line, Inc., 541 F.2d 985, 987 (2nd Cir.1976) (emphasis added). In the instant case, there is no similar concern that the decedent's estate is particularly subject to the influence of B & W. Moreover, current caselaw recognizes the great value of finality even in settlement proceedings between shipowners and seamen. See, e.g., Borne v. A & P Boat Rentals No. 4, Inc., 780 F.2d 1254, 1257 (5th Cir. 1986).[6]
The Court is loathe to protract this litigation by subjecting B & W's release to further discovery and fact-finding. This is especially so when such a ruling would enable nonsettling defendants to thwart at will the intentions of the settling parties by simply suggesting that a given settlement may be inadequate. *1448 Although the burden on a proponent of a seaman's release is heavy on a motion for summary judgment, the party objecting to the release still must establish a genuine issue of material fact. Durden, 803 F.2d at 847-48. Given the record before the Court and the speculative nature of USX's complaints, USX has failed to establish any concrete issues of material fact.

B. The Claim for Indemnity
USX bases its indemnity claim on two grounds: the right of vicariously liable defendants to seek indemnity from co-tortfeasors guilty of actual fault, and B & W's implied-infact contractual obligation to indemnify USX for any unseaworthiness liability which B & W created by breaching its duty of workmanlike performance.

1. Indemnification Based on Vicarious Liability
A vicariously liable or non-negligent tortfeasor is entitled to indemnity from a co-tortfeasor guilty of actual fault. Miller v. American President Lines, Ltd., 989 F.2d 1450, 1463 (6th Cir.1993); Hardy v. Gulf Oil Corp., 949 F.2d 826, 833 (5th Cir.1992). Because unseaworthiness liability can include liability without fault, see Miller, 989 F.2d at 1462 (citing Seas Shipping Co. v. Sieracki, 328 U.S. 85, 94, 66 S.Ct. 872, 877, 90 L.Ed. 1099 (1946)), a defendant without fault but nonetheless held vicariously liable in an unseaworthiness action may seek indemnification from a defendant actually at fault.[7]
The above recitation of the law, however, has little relevance in the instant case, where the potential indemnitor has settled with the plaintiff. Given that USX can invoke indemnification based on purely vicarious liability only if it is completely faultless, simple application of the proportionality principles in McDermott and Boca Grande reveals that an indemnity action against B & W is precluded. Indemnification is barred for the same reason that contribution is barred: any award against a nonsettling defendant always will be reduced by the settling defendants' proportion of fault. USX cannot seek indemnity against B & W because USX will never be responsible for B & W's equitable share of fault, regardless of whether USX is found to be 0% or 100% at fault.
USX's insistence that it retains a right to indemnification implies illogical results. For example, assume that USX was found to be vicariously liable, B & W was found to be completely at fault, and Geyer's total damages were found to be $100,000. A claimed need for indemnification from B & W in the above case implies that USX still would have to pay Geyer the $100,000 award. This is simply not true: if USX was guilty only of vicarious liability without fault, USX would not be obligated to pay Geyer anything, and Geyer's damages would be reduced to zero. Implying that a faultless USX would have to pay Geyer her entire $100,000 award also ignores the fact that, assuming that B & W was 99% at fault, a 1% at fault USX would have to pay Geyer only $1000.

2. Indemnification Based on Contractual Obligation
Under the Ryan doctrine, a contractor's promise to perform services for a shipowner can imply an agreement to indemnify the shipowner for liability resulting from the contractor's failure to perform the services *1449 in a reasonably safe manner. Phillips Petroleum Co. v. Stokes Oil Co., Inc., 863 F.2d 1250, 1255-56 (6th Cir.1988) (citing Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956)). This obligation to indemnify is contractual and is implied in fact, not in law. Ryan, 350 U.S. at 133, 76 S.Ct. at 237. "The warranty of workmanlike service can be breached and indemnity awarded even if the contractor has not acted negligently when furnishing latently defective equipment." Oglebay Norton Co. v. CSX Corp., 788 F.2d 361, 365 (6th Cir.1986). Similarly, any fault on the part of the shipowner does not bar a claim for indemnity under the Ryan doctrine unless such fault, when compared to the contractor's breach of its warranty of workmanlike service, constitutes "conduct which prevented or seriously hampered [a contractor's] performance of its duty in accordance with its warranty." Id. at 366 (citations omitted), 367 n. 13. The Sixth Circuit has interpreted the Ryan doctrine as an attempt to alleviate the burden imposed on shipowners by the nondelegable duty of seaworthiness, which creates liability regardless of negligence. Phillips, 863 F.2d at 1256.[8]
Whether a contractor has an implied contractual obligation to indemnify a shipowner turns upon whether the contractor performed the liability-generating services without the supervision or control of the shipowner. Oglebay Norton Co. v. CSX Corp., 788 F.2d 361, 364-65 (6th Cir.1986); McCune v. F. Alioto Fish Co., 597 F.2d 1244, 1251 (9th Cir.1979). Courts often inquire whether the shipowner "relinquished control" or "entrusted his vessel" to a contractor who then rendered the vessel unseaworthy. See Rufolo v. Midwest Marine Contractor, Inc., 6 F.3d 448, 453 (7th Cir.1993); Hardy v. Gulf Oil Corp., 949 F.2d 826, 834 (5th Cir.1992). The Sixth Circuit has emphasized that the Ryan doctrine seeks to minimize hazards to seamen by allocating ultimate responsibility to those parties best situated to prevent accidents. Oglebay, 788 F.2d at 365. Courts have applied the Ryan doctrine to contracts involving stevedores, launch services, and repairpersons. McCune, 597 F.2d at 1251. Courts, however, have refused to apply the Ryan doctrine to mere suppliers of products, see id., such as suppliers of asbestos products used in boilers on ships. See Vaughn v. Farrell Lines, Inc., 937 F.2d 953, 956 n. 4 (4th Cir.1991).
Summary judgment therefore is appropriate only if no genuine issue of material fact exists as to whether a contract for the performance of services, without the supervision or control of USX, existed between USX and B & W.[9] USX has submitted documents claimed to have been obtained from B & W's *1450 counsel. The documents consist of an decades-old contract between B & W and the Pittsburgh Steamship Company for the provision of boilers for two vessels, as well as subsequent correspondence and reports relating to the execution of that contract. USX described these documents as showing that
B & W at times provided services in conjunction with boiler sales, including: superintending assembly of boilers on the foundations in the vessels; superintending installation of the boilers in the vessel; supervision of boiler and stoker erection; services of a combustion control engineer; servicing of Bailey Meter Combustion Control equipment; and service from B & W's Marine Service Division.
USX's September 9, 1994, Response to B & W's Motion to Dismiss, p. 17 n. 9 (referring to Exhibit B attached thereto). B & W's only response to the submission of these documents has been to state that they "were not accompanied by a supporting affidavit and are therefore conspicuously lacking in identification and authentication. USX has failed to introduce any evidence that a contract for the performance of services, without the supervision and control of USX, existed between USX and B & W." B & W's October 7, 1994, Reply to USX's Response to B & W's Motion to Dismiss, p. 12 n. 18.
The documents indeed do raise factual issues concerning the degree of control and supervision which B & W exercised in installing and servicing boilers purchased by Pittsburgh Steamship. For example, several memoranda from B & W refer to B & W's duty to provide an experienced engineer to supervise the installation of the boilers and service them once installed. See USX's Exhibit B, p. 53, 68, 72, 74, 137, 143, 162, 164. See also p. 49, 61, 226, 741.
Admittedly, it is unclear whether the documents submitted by USX concern a contract actually between B & W and USX or one of its subsidiaries, or a contract for asbestos-containing products to which the decedent actually was exposed. B & W, however, merely has questioned the documents' authenticity. Furthermore, B & W has not denied that USX obtained these documents from B & W. Regardless, the documents at least demonstrate a genuine issue of material fact as to whether B & W at one time had a general business practice of providing expert services to all purchasers of its products. Further, USX also submitted the deposition testimony of Ralph H. Bertz, who apparently worked as an engineer for a wholly-owned subsidiary of USX. Mr. Bertz has stated that USX had a policy of requesting the manufacturers of boiler equipment to provide assistance and advice in the boiler work on USX ships, and that certain major but inevitable boiler repair work sometimes would have to be done by an outside vendor skilled in such repair. USX's Exhibit C, p 17, 130-32.
Given B & W's failure to proffer any evidence indicating that it did not contract with USX to perform services without USX's control or supervision, and USX's submission of documents suggesting that such a contract did exist, summary judgment would be inappropriate.

IV. CONCLUSION
For the above-stated reasons, cross- and third-party defendants' motion for summary judgment shall be, and hereby is, GRANTED as to cross- and third-party plaintiff's claim for contribution, shall be, and hereby is, GRANTED as to cross- and third-party plaintiff's claim for indemnification based on vicarious liability, but shall be, and hereby is, DENIED as to cross- and third-party plaintiff's claim for indemnification based on potential contractual obligation.
So Ordered.
NOTES
[1] Although the instant action was transferred to the Eastern District of Pennsylvania for coordinated pre-trial proceedings, it subsequently has been remanded to this Court for trial.
[2] The conversion of this motion into one for summary judgment should surprise neither party, both of whom have recognized the appropriateness of doing so. Note that the conversion moots suggestions by B & W that USX failed to plead certain indemnity claims with sufficient specificity. See 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1366 (1990).
[3] USX might be understood to be suggesting a hyper-technical reading of McDermott: because McDermott often referred to "joint-tortfeasors," and because no binding determination of B & W's joint-tortfeasor status has been made, B & W cannot be regarded yet as a joint-tortfeasor, and therefore McDermott is inapplicable. This reading, however, would mock McDermott's aim to reduce litigation costs, encourage settlements, and conserve judicial resources.

What is important for the purposes of USX's contribution claim is B & W's status as a settling defendant, not as a joint-tortfeasor. See Boca Grande, 511 U.S. at ___, 114 S.Ct. at 1472 (expressly holding that "actions for contribution against settling defendants are neither necessary nor permitted") (emphasis added).
[4] The Eleventh Circuit' holding in Ebanks v. Great Lakes Dredge & Dock Co., 688 F.2d 716, 722 (11th Cir.1982) (error to require jury to allocate degree of fault between defendant and non-party) was based on the assumed propriety of contribution claims against settling defendants and presumably has been overruled.

The one case that USX cites as an indication that settling defendants should remain as parties, Carr v. American Red Cross, 17 F.3d 671, 683 (3rd Cir.1994), is unpersuasive, as it was decided before Boca Grande and rests solely on Pennsylvania law.
[5] Docket Entries 254-256 indicate that when Geyer's consent judgment was entered against B & W for $5,000, similar judgments were entered against defendants Foster Wheeler Corp. for $1,500, M.H. Derrick Co. for $3,000, and Grant Wilson Inc. for $2,500.
[6] The desire to encourage finality in settlement proceedings arguably is beginning to eclipse the desire to severely scrutinize seamen's releases, a practice whose more antiquated justifications include the notion that seamen harbor a "propensity towards `rashness' and `credulity.'" See Capotorto, 541 F.2d at 987.
[7] Miller held that a contribution claim arising out of unseaworthiness liability in a maritime asbestos case should have been analyzed according to comparative fault principles, rather than according to the outdated doctrine of "active/passive negligence." Miller, 989 F.2d at 1459-63.

Certain language in Miller suggests that unseaworthiness liability necessarily precludes a right to indemnity. For example, Miller the court stated that "references to strict liability as liability `without fault,' ignore the notion of fault that is inherent in the concept of strict liability." Id. at 1461. However, the indemnitee in Miller was a shipowner not only held liable under an unseaworthiness claim, but also found guilty of wilful and wanton misconduct. Therefore, although the Miller opinion was not a model of clarity, the point it presumably was trying to make is that it is possible for a defendant to be both vicariously liable and actually at fault. Allowing indemnity actions for defendants found by the jury to have been liable as unseaworthy yet nonetheless faultless accords with the Miller opinion's later statement that vicariously liable defendants may seek indemnity, and with its citations to case law allowing faultless shipowners to seek indemnity. Id. at 1463.
[8] The continuing viability of the Ryan doctrine is admittedly somewhat suspect. At least one circuit has been extremely reluctant to expand the theory beyond its original facts or apply it when the shipowner is not completely free of fault. See, e.g., Hardy v. Gulf Oil Corp., 949 F.2d 826, 834 (5th Cir.1992); Verdin v. C & B Boat Co., Inc., 860 F.2d 150, 156 (5th Cir.1988). But see Wingo v. Celotex Corp., 834 F.2d 375, 377-78 (4th Cir.1987) (acknowledging that Ryan-type indemnity may exist even where the shipowner has been guilty of actual fault). Even the Sixth Circuit's most recent description of currently viable theories of indemnification recognized express contractual indemnification agreements but failed to mention implied-in-fact contractual indemnification agreements. See Miller v. American President Lines, Ltd., 989 F.2d 1450, 1463 (6th Cir.1993). Further, now that the principles of proportionality apply to all claims for contribution in maritime tort cases, the original and main purpose of the Ryan doctrine, to avoid making purely vicarious shipowners pay for the mistakes of negligent contractors, can be achieved without reliance upon an implied contractual obligation. But see Cooper v. Loper, 923 F.2d 1045, 1051 (3rd Cir.1991) (stating that Ryan-type indemnity actions are not resolved by tort principles of apportionment of fault because Ryan actions are based on contract).

In the absence of a more express directive from the Sixth Circuit, however, and because the discussions in Phillips and Oglebay necessarily assumed that Ryan-type indemnity continues to exist, this Court cannot simply dismiss Supreme Court precedent as no longer good law. See also Oglebay, 788 F.2d at 364 n. 5 (stating that "it appears that Ryan and its progeny continue to be good precedent," but noting that other circuits have held otherwise).
[9] Even if the Ryan doctrine applies only when the injuries occurred while the contractor was in the very act of performing its services, Geyer's complaint alleges that the decedent installed asbestos-containing products during his employment on USX's vessel. Plaintiff's December 19, 1991, Complaint and Jury Demand, p. 2.